## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL YEE, individually and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>KALSHIEX LLC; KALSHI INC; KALSHI KLEAR LLC; KALSHI KLEAR INC., KALSHI TRADING LLC, and DOES 1-20,<br><br>Defendants. | Case No.  25-cv-8585<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

1.      Plaintiff brings the following allegations on behalf of himself and all others similarly situated, based on his personal knowledge as to the facts pertaining to Plaintiff, and based on the investigation of counsel and information and belief as to all other allegations:

## I.     INTRODUCTION

2.      Defendants KalshiEX LLC, Kalshi Klear LLC, Kalshi Klear Inc., Kalshi Trading LLC, and Kalshi Inc. (together, "Kalshi") operate an unlawful sports gambling platform, falsely claiming that sports betting is "now legal in all fifty states."

3.      Despite Kalshi's bold claim, which it makes across the country, Kalshi's operations violate the specific laws of over two dozen additional states that prohibit gambling or expressly allow for the recovery of gambling losses.[1] And as a New York headquartered company that includes a New York choice of law clause in its terms of service, Kalshi is subject to the licensing and registration requirements of New York—yet, it has failed to comply with those regulations, rendering the rest of its nationwide operations illegal too.

---

[1] Alabama, Arkansas, Connecticut, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Vermont, Virginia, Washington, West Virginia, and Wisconsin. Kalshi's practices also violate laws like California's criminal ban on "bets and wagers" pursuant to Penal Code Section 337a.

4.      Based on Kalshi's false representations, Plaintiff Daniel Yee ("Plaintiff") and the Classes bargained for entry into legal sports gambling contests. But all they received from Kalshi was entry into illegal sports gambling contests. Plaintiff and the Classes did not receive the benefit of the bargain, as the illegal entries had substantially less (in fact zero) value than entry into legal contests. Moreover, if Kalshi had accurately disclosed the unlawful nature of the gambling services, Plaintiff and the Classes would not have purchased Kalshi's sports gambling services at all.

5.      Accordingly, Plaintiff brings this action against Kalshi--one of the largest sports betting operators in the country—seeking to recover the hundreds of millions of dollars that Kalshi has unlawfully taken from him and the Classes.

## II.     **PARTIES**

### A.     **Plaintiff.**

6.      At all times relevant to this action, Plaintiff Daniel Yee was over the age of 18 and was a resident of San Francisco, California.

### B.     **Defendants.**

7.      Defendant Kalshi Inc. is a Delaware corporation and the parent and/or corporate affiliate of KalshiEX LLC. Kalshi Inc. maintains a principal place of business at 594 Broadway, Room 407, New York, NY 10012. Kalshi Inc. is the sole owner of Kalshi Klear Inc., KalshiEX LLC, and Kalshi Trading LLC, and is believed to conduct substantial business across the United States, including in this District, and to derive substantial revenue from those operations.

8.      Defendant KalshiEX LLC is a Delaware limited liability company. KalshiEX LLC's principal place of business is 594 Broadway, New York, NY 10012. KalshiEX LLC conducts substantial business across the United States, including within this District, and derives substantial revenue from those operations. In concert with the other Kalshi entities, KalshiEX LLC operates a prediction market, allowing the State's residents to place illegal, unregulated sports wagers in the form of event contracts.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

9.     Defendant Kalshi Klear Inc. is a Delaware corporation. Kalshi Klear Inc. maintains a principal place of business at 594 Broadway, Room 407, New York, NY 10012. Kalshi Klear Inc. is a wholly owned subsidiary of Kalshi Inc., and the sole member of Kalshi Klear LLC. As such, Kalshi Klear Inc. operates as a registered derivatives clearing organization and, in concert with other Kalshi entities, operates a prediction market, allowing the State's residents to place illegal, unregulated sports wagers in the form of event contracts.

10.    Defendant Kalshi Klear LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a registered derivatives clearing organization. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated sports wagers in the form of event contracts.

11.    Defendant Kalshi Trading LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. On information and belief, it is a wholly owned subsidiary of Kalshi Inc. that operates as a market maker for Kalshi's prediction market, buying and selling event contracts on the platform. In concert with other Kalshi entities, it operates a prediction market, allowing the State's residents to place illegal, unregulated sports wagers in the form of event contracts.

12.    Does 1-20 are individuals and/or entities who facilitate Defendant Kalshi's unlawful practices described in this Complaint. The identities of Does 1-20 are not presently known to Plaintiff. The Doe defendants, and the Kalshi entities, are collectively referred to in this Complaint as "Defendants" or "Kalshi." Plaintiff expressly reserves the right to amend this Complaint to add the Doe defendants by name, once their identities are known.

13.    Each Defendant is a "person" and/or engages in "business" and has transacted business within this District by offering, marketing, facilitating, and profiting from event-contract products to consumers residing in and/or accessing the platforms within this state and across the country.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

### III.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over the parties in this matter because Defendants regularly conduct business within this District, including by engaging in the unlawful gambling practices that are at the center of this action.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c) because Defendants' unlawful actions, which are the subject of this action, occurred in this District.

### IV.    LEGAL BACKGROUND

#### A.    Sports Betting Is Governed by State Law.

17.     Sports gambling is one of the most highly regulated industries in the United States. Until the Professional and Amateur Sports Protection Act ("PASPA," 28 U.S.C. §§ 3701 *et seq.*) was overturned in 2018, it was illegal in most of the United States. *See Murphy v. Nat'l Collegiate Athletic Ass'n¸* 584 U.S. 453 (2018).

18.     Since the Supreme Court confirmed in *Murphy* that states, not the federal government, may regulate sports betting, at least 40 states and territories have enacted legislative and regulatory schemes that permit licensed sports betting within their borders—but prohibit operations that violate state regulations and operations by entities that fail to register with the state.

19.     Additionally, many states—while authorizing sports betting and other gambling— continue to allow participants in those gambling contests to seek recovery of their gambling losses.

20.     The various state and jurisdictional laws that allow such recovery are traced from a 1710 British law passed during the reign of Queen Anne ("the Statute of Anne"), which makes certain gambling debts unenforceable, and allows a losing party to sue the winning party for the value of losses. Certain jurisdictions also allow private or third parties to initiate the lawsuit and

recover against the winning party for treble damages as a financial incentive to induce the public to investigate and pursue claims against gamblers.

**B.      New York, Where Kalshi Is Headquartered, Regulates Sports Gambling Through Licensing Requirements, Prohibitions on Unlicensed Wagering, and Prohibiting Unfair and Deceptive Practices.**

21.      New York, where Kalshi is headquartered, is one such state.

22.      In New York, legal gambling operations are governed by the New York Racing, Pari-Mutuel Wagering and Breeding Law. N.Y. PML §§ 100 *et seq.* Sports wagering is regulated in PML §§ 1367 and 1367-a. Section 1367-a(2)(a) of the PML provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission."

23.      Other than wagering allowed under the PML through licensed entities, "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." N.Y. Gen. Oblig. § 5-401.

24.      New York also maintains its version of the Statute of Anne, which enables the loser to recover unlawful gambling debts within three months. N.Y. Gen. Oblig. Law §§ 5-419, 5-421.

25.      New York also generally prohibits deceptive acts and practices, including false advertisements. *See* New York General Business Law Section 349(a) ("[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful") and 350 ("false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.").

**C.      California, Where Plaintiff Resides, Continues to Ban All Forms of Sports Betting.**

26.      Many states continue to ban all forms of sports betting, including Alaska, California, Hawaii, Idaho, Nebraska, North Dakota, Oklahoma, Texas, and Utah. California, where Plaintiff resides, has flatly rejected and criminalizes sports betting.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1.     **California's Longstanding Ban on Gambling.**

27.     For over 150 years, California has broadly prohibited commercialized gambling.

28.     For example, in 1872, California enacted Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee . . . *any banking or percentage game* played with . . . *any device*, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor." CAL. PENAL CODE § 330 (emphasis added).

29.     A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox,* 189 Cal. App. 3d 673, 678 (1987). And a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants, but is not directly involved in game play. *See id. at* 679.

30.     Similarly, California Penal Code Section 337a prohibits additional conduct, including:

- "*Pool selling* or *bookmaking*, with or without writing, at *any time or place*." CAL. PENAL CODE § 337a(a)(1) (emphasis added).

- *"[R]eceiv[ing], hold[ing], or forward[ing]* . . . in *any manner whatsoever*, any *money . . . staked, pledged, bet or wagered*, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance of *person* or animal, or between *persons*, animals, or *mechanical apparatus*, or *upon the result, or purported result, of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(3) (emphasis added).

- "[A]t *any time or place, record[ing], or register[ing] any bet* or bets, *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of *skill*, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus*, or upon the

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

result, or purported result, *of any* lot, chance, casualty, *unknown or contingent event whatsoever.*" *Id.* at (a)(4) (emphasis added).

- "*[O]ffer[ing] or accept[ing] any bet* or bets, or *wager* or wagers, *upon the result*, or purported result, *of any* trial, or purported trial, or *contest*, or purported contest, of skill, speed or power of endurance *of person* or animal, or *between persons*, animals, or *mechanical apparatus.*" *Id.* at (a)(6) (emphasis added).

31.    The terms used in Section 337a have their commonsense meanings. For example, the California Court of Appeal has explained that "'[p]ool selling' is the selling or distribution of shares or chances in a wagering pool," such as when money wagered by all participants is combined into a single pool and the winnings are distributed based on predetermined rules. *See Finster v. Keller,* 18 Cal. App. 3d 836, 846 (1971) (cleaned up). And "'[b]ookmaking' is the making of a betting book and includes the taking of bets, [and] [t]he taking of one bet is sufficient" to constitute "bookmaking." *People v. Thompson*, 206 Cal. App. 2d 734, 739 (1962) (cleaned up).

32.    Similarly, "bet" and "wager" have their commonsense meanings. For example, the Judicial Council of California Criminal Jury Instructions (2025 Edition) provides that a "bet is a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest." CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).[2]

33.    "Bets" and "wagers" include entry fees paid in online fantasy sports. *Los Angeles Turf Club v. Horse Racing Labs, LLC,* 2017 WL 11634526, at *8 (C.D. Cal. May 15, 2017).

34.    Put simply, a company violates California Penal Code Section 337a when it engages in pool selling, bookmaking, or accepts or records any bets or wagers on the result of any

---

[2] Available online at https://www.justia.com/criminal/docs/calcrim/2900/2993/ (last visited Oct. 16, 2025).

contest and/or any unknown or contingent event whatsoever—including, without limitation, bets associated with the performance of persons.[3]

35.     Moreover, various sections of the California Penal Code prohibit "lotteries" and "games of chance."

36.     For example, Penal Code Sections 320 and 321 make the operation of a lottery unlawful: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"[4] and "[e]very person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor."[5] Penal Code Section 319 defines a lottery broadly to include "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known." CAL. PENAL CODE § 319.

37.     Similarly, Penal Code Section 330a makes it unlawful to own or operate any "contrivance, appliance, or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded . . . [that] is won or lost . . . dependent upon hazard or chance." CAL. PENAL CODE § 330a.

38.     And Penal Code Section 337j makes it unlawful to operate a "game of chance" or to "receive, directly or indirectly, any compensation" for operating such a game "*without having*

---

[3] While Section 337a violations are reduced to infractions in certain circumstances for non-commercial gambling in amounts below $2,500, the Section 337a reductions expressly do "not apply to . . . [a]ny bet, bets, wager, wagers, or betting pool or pools made online." CAL. PENAL CODE § 336.9(b)(1).

[4] CAL. PENAL CODE § 320.

[5] CAL. PENAL CODE § 321.

*first procured . . . all federal, state, and local licenses required by law.*"  CAL. PENAL CODE § 337j(a) & (a)(2). (emphasis added).

39.     In fact, as the California legislature re-affirmed in 2008, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

### 2.    Supermajorities of the California Electorate Rejected the Gambling Industry's Attempts to Legalize Sports Betting in 2022.

40.     In 2022, two ballot initiatives were put to the California voters to legalize certain additional forms of gambling in the state, including various forms of sports betting: Proposition 26 and Proposition 27.

41.     Proposition 26 was primarily sponsored by California's Native American tribes, and, among other things, would have:

- Legalized in-person sports betting at tribal casinos.
- Allowed additional gambling at tribal casinos, including roulette and dice games like craps.
- Established certain taxes and fees associated with sports betting.

42.     Proposition 26, however, was soundly rejected in November 2022, with approximately 67% of the California electorate voting "no."

43.     Proposition 27 aimed to legalize online sports betting in California, and was primarily sponsored by the online sports betting industry, with the Washington Post reporting that "the industry ultimately spent $150 million on political ads"[6] in an attempt to legalize online gambling in California.

44.     Among other things, Proposition 27 would have:

- Legalized and regulated online sports betting in California.

---

[6] Gus Garcia-Roberts, *Inside the $400 million fight to control California sports betting,* WASH. POST (Nov. 3, 2022), https://www.washingtonpost.com/sports/2022/11/03/prop-26-27-california-sports-betting/ (last visited Oct. 16, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- Established a new division within the California Department of Justice to set license requirements and oversee the industry.

- Imposed a 10% tax on sports betting revenue and established licensing fees.

- Allocated revenue from online gambling to homelessness prevention.

45.    Proposition 27 was also soundly rejected in November 2022, with 82% of the electorate voting "no," making it one of the largest margins of defeat in California ballot proposition history.

**D.    Over Thirty States Authorize the Recovery of Gambling Losses Through Statute of Anne Laws.**

46.    As discussed above, at least thirty other states and jurisdictions authorize the recovery of gambling losses through their respective versions of the Statute of Anne. The following section identifies two categories: jurisdictions that (1) permit sports betting but allow the recovery of gambling losses and (2) jurisdictions that do not permit sports betting, but still allow the recovery of gambling losses.

**1.    Jurisdictions Where Gambling Is Legal but Loss-Recovery Statutes Apply**

47.    In addition to New York, the following jurisdictions permit gambling but maintain statutes allowing recovery of gambling losses or voiding of wagers, or permit recovery of gambling losses when gambling was not lawful or otherwise authorized where legal gambling could be lawful or could otherwise be authorized: Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Florida (Fla. Stat. §§ 849.12, 849.26, 849.29), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code §§ 34-16-1, 34-16-2), Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Maryland (Md. Code Ann., Crim. Law § 12-110), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Michigan (Mich. Comp. Laws §§ 730.315, 600.2939(1)), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Rev. Stat. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn.

Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), and West Virginia (W. Va. Code § 55-9-2).

> ## 2. Jurisdictions Where Gambling Is Illegal and Loss-Recovery Statutes Apply

48.     Gambling remains unlawful in the following jurisdictions, where consumers may still seek recovery for gambling losses: Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.20), Mississippi (Miss. Code Ann. § 87-1-5), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.74), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. Ann. § 895.056).

## FACTS COMMON TO THE CLASSES

> ### A. Kalshi's Expansion into Sports Betting & Gambling Operations

> #### 1. Overview of Kalshi

49.     Kalshi is a private technology company that operates what it claims to be a web-based "prediction" trade-based platform (herein referred to as the "Gambling Website" or Kalshi's "Platform"). In reality, what Kalshi's Platform actually offers is illegal sports betting and gambling.

50.     Kalshi was co-founded in 2018 by Tarek Mansour and Luana Lopes Lara. Kalshi's platform enables consumers to place bets through its website, https://kalshi.com, and through its mobile application offered on Android and iOS (Apple platforms).

51.     Kalshi's platform offers so called "binary" positions (Yes or No), where consumers can make bets on uncertain results of certain real-world prospective events that will result in either binary result (Yes—occurred; No—Did not occur). Kalshi calls these positions "event contracts." Kalshi's use of the term "event contract" is a guise for sports betting, given the "event contracts" function the same as placing a sports wager. In other words, the sports related "event contracts" are merely sports wagers.

52.    The bets are priced from $0.01 to $0.99 per unit and settle at $1 for the correct outcome and $0 for the incorrect one. Consumers may buy or sell incremental positions prior to a settlement based on perceived probabilities reflected in the market price.

53.    Kalshi makes money by raking in a fee on each transaction made on the platform.

54.    Bettors deposit funds into their Kalshi account and use those funds to place bets. Any return on a successful wager will remain in the bettor's Kalshi account until they choose to withdraw. Kalshi charges a fee for certain deposit and withdrawal methods.

55.    Kalshi matches bettors on opposite sides of the event contract (the "yes" and the "no") so that the combined wager from both bettors equals $1.

56.    If the price changes, bettors may "sell" their wager before the event takes place.

57.    Kalshi's affiliated entity, Kalshi Trading LLC, fills a role similar to that of the house in a classic gambling operation, by acting as a market maker on its platform. It supplies liquidity by placing both buy and sell orders for event contracts, ensuring that bettors can wager at nearly all times. It takes opposing positions, absorbs imbalances in bettor demand, and profits from price movements.

58.    Kalshi also has an affiliated clearinghouse under common ownership called Kalshi Klear LLC that finalizes and settles event contract wagers. Kalshi Klear is responsible for determining outcomes, issuing payouts, and processing the movement of funds between bettors once an event is resolved. It functions entirely within Kalshi's corporate structure and does not serve as an independent intermediary. This arrangement allows Kalshi to control each stage of the wager. Kalshi writes the rules for the contract, determines the basis for settlement, and oversees the payment process.

59.    Kalshi's use of its own clearing agent reveals that the company is not merely providing a platform for third-party trading. It is administering a closed-loop wagering system, where it creates the games, handles the bets, and pays out the winners.

## 2.    Kalshi's Evolution into Sports Betting

60.    Initially, when Kalshi launched in July 2021, the platform focused exclusively on future, real-world economic performance indicators.  For example, users could wager on binary outcomes such as whether inflation would increase—yes or no.  Based on the bettor's selection and the amount wagered, payouts were determined by the validity of the prediction, with winners receiving returns and incorrect guesses resulting in losses.  Initially, the platform included a range of macroeconomic benchmarks, such as Consumer Price Index (CPI), unemployment rates, and other key indicators. These non-sports related bets and wagers are outside the scope of this action.

61.    After Kalshi positioned itself as the platform for trading "event contracts" (bets) on economic indicators, Kalshi expanded from the previous types of economic events or certain market indicators, to reach far more types of events.

62.    In October 2024, Kalshi started offering political event contracts, allowing users to wager on outcomes such as party control of Congress, or whether specific candidates would win the presidency.  These contracts were marked as tools for exercising "civic knowledge," but in practice, the contracts functioned as binary bets with a fixed payout for a correct prediction and nothing for an incorrect one.  The speculative pricing and risk structure mirrored traditional betting, raising concerns that these products were mere gambling, even if Kalshi did not label them as such.

63.    On January 23, 2025, Kalshi began offering sports event contracts.  Kalshi now advertises that consumers can place bets on outcomes such as the winner of the Super Bowl, March Madness, or individual player achievements.

64.    In March 2025, Robinhood, a stock-trading platform, integrated Kalshi event contracts into the Robinhood app and website, enabling millions of Robinhood users to gamble on Kalshi by way of Robinhood's familiar trading interface.[7]

---

[7] Robinhood uses Kalshi's platform through Robinhood Derivatives, LLC, which operates as a Futures Commission Merchant ("FCM") of Kalshi through agreements with KalshiEX LLC and Kalshi Klear LLC, including Kalshi's FCM Membership Agreement and a FCM Clearing Member Agreement. *See, e.g., Robinhood Derivatives, LLC v. Andrea Joy Campbell, et al.,* No.

65.    Robinhood's integration of Kalshi expanded consumer access to even-outcome wagering nationwide, including California and within this district. By embedding gambling products inside a securities-trading app, Robinhood normalized wagering adjacent to investing, presenting event-outcome speculation in the same environment where users trade stocks and options. In doing so, Robinhood blurred the line between investing and betting for retail consumers and helped rapidly scale adoption of Kalshi's sports-centric products.

66.    Indeed, Robinhood—a public traded entity—reported by Q2 2025 approximately $1 billion worth of trading of Kalshi contracts, which generated an estimated $10 million in revenue for Kalshi through the Robinhood application, alone.

67.    By spring 2025, approximately 70–75% of Kalshi's trading volume was sports-related, and public reports indicate Kalshi's sports revenues outpaced certain licensed sportsbooks over comparable periods, as well as fantasy sport betting platforms. *See, e.g.*, Daniel O'Boyle, Kalshi More Reliant On Sports Than DraftKings Or FanDuel, Data Shows, INGAME (Updated May 21, 2025), https://www.ingame.com/kalshi-sports-data-trading-volume/ (noting "[m]ore than three-quarters of Kalshi's trading volume now comes from sports…[t]he figures suggest that Kalshi makes a larger percentage of its money from sports than DraftKings or FanDuel—businesses that are almost synonymous with sports betting in the U.S.").

68.    Kalshi sports betting now dominates the trading platform, with sports betting monthly trading volume at $1.8 billion and non-sports trading at 0.25 billion in September, 2025.[8]

69.    In August through September 2025, Kalshi expanded further in to sports gambling by offering categories that mirror traditional sports betting, including bets related to point spreads, totals/over-unders, player props (e.g., first or any touchdown), and parlays.

---

1:25-cv-12578 (D. Mass. filed Sept. 18, 2025) (Dkt. No. 16 (Memorandum in Support of Motion to Seal)).

[8] https://www.wsj.com/sports/football/kalshis-rise-shakes-up-nfl-sunday-31cd81d6?st=Y18ntt&reflink=article_copyURL_share

70.     As of June 2025, Kalshi had roughly two million users and touted nationwide reach. Kalshi was also valued at $2 billion.[9]

**B.     Kalshi's Platform Enables Gambling**

71.     As described above, Kalshi introduced sports wagering on January 23, 2025.

72.     Kalshi's platform employs manipulative, deceptive, and addictive tactics that are similar to other gambling platforms to encourage impulsive decisions, exploiting any awards, and operating as unlawful and unlicensed gambling.

73.     Kalshi's sports betting markets structured as "Yes/No" contracts, all-or nothing payout, which settle at $1.00 for the correct outcome and $0.00 for the incorrect outcome, is indistinguishable from a moneyline sports wager.

74.     More importantly, Kalshi employs classic sports-betting categories: money line winner markets, spreads, totals, props and parleys. These terms do not exist independent of the sports betting industry and relate to nothing except variations of ways to hedge or bet risk on mere games, pending the outcome of entirely independent events that relate to nothing paid or exchanged in return for monetary value. Indeed, Kalshi "event contracts" for sports wagers constitute the most basic definition of gambling.

75.     Kalshi's ability to match opposing positions and trade in-game collectively mirror sports wagers, or the exchange wager, where consumers bet against one another with dynamic pricing. These are the most typical and classic forms of sports wagering.

76.     Kalshi's Gambling Website and Platform use a layout that encourages high-risk transactions by emphasizing reward while obscuring risk.  For example, potential payouts are presented in bright green font, a color that signals safety and correctness, to emphasize the attention to the profits. In contrast, cost and odds appear in standard black text, diminishing their visual prominence. Moreover, Kalshi only represents the potential outcome upon the purchase of $100 worth of a "Yes" or "No" contract.

---

[9] "Kalshi valued at $2 billion in latest funding round, CEO says," Reuters, 2025-06-25, https://www.reuters.com/technology/kalshi-valued-2-billion-latest-funding-round-ceo-says-2025-06-25/, (last visited Oct. 16, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

77.     Each event contract webpage has an "Ideas" tab and "Activity" tab. The former invites users to post their "prediction" and allows them to interact with other user's posts, including replying, liking, bookmarking, and sharing with others. The latter tab shows the number of purchased and sold "Yes" and "No" contracts updated in real time.

78.     Kalshi also offers a continuously updating ticker tape of market activity and a "people are also buying" on the event contract wager page before placing a wager, in addition to a "people also bought" prompt immediately after users place a wager, sustaining real-time stimulation and encouraging further speculation without pause. These features mirror known psychological triggers of gambling behavior and are engineered to increase user retention and transaction volume.

79.     This uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms, modeled after operant conditioning and slot machine dynamics, can bypass rational evaluation and contribute to excessive financial risk-taking.

80.     Kalshi also utilizes competitive and social comparison metrics to encourage betting, including public leaderboards to rank its bettors based on profits and volume on a daily, weekly, monthly, and all-time basis.  The leaderboards serve no market purpose; instead, they promote repeated high-risk behavior by rewarding speculative successes with community recognition.

81.     The leaderboard rankings, displayed with usernames, avatars, and performance stats, mimic leaderboards utilized in video games and other platforms such as fantasy contests and social casinos, and encourage users to chase short-term gains.

82.     There is also a countdown clock in the top right corner appearing in blue that reflects the remaining time for the time-limited leaderboards, as well as a button to "Join" either the profit or volume leaderboards, respectively. These features only serve to instill further incentive and pressure for users to appear on the leaderboard.

83.    User profiles add another layer to Kalshi's encouragement of engagement and speculation. Bettors may create a profile with a nickname, profile picture, and description to "interact with other traders."[10] These profiles may publicly display detailed wagering metrics, including potential payouts, cumulative profit, total volume transacted, and the number of wagers made, depending on the user's privacy setting. Making these features public allows the bettor to compete on the leaderboard. If made public, these figures appear prominently beneath each bettor's profile name and avatar, alongside a timeline of their recent transactions and posts, replies, and "likes" (i.e. their interactions with other Kalshi users) on the Kalshi platform.

84.    Bettors are encouraged to post their "prediction" on the event contract page under the "Ideas" tab, which facilitates a messaging function for bettors to engage with each other. Bettors can reply, like, bookmark, and share other user's posts.

85.    User profiles serve as performance dashboards that encourage bettors to compete, compare, and signal success. The interface reinforces speculative behavior through design choices modeled on gambling platforms, including rapid trade cycling, reward anticipation, and mechanisms known to trigger compulsive engagement loops.

### 3.    Kalshi Claims its Sports Betting is Legal Nationwide

86.    Kalshi advertises its sports gambling products nationally, through its website and mobile application, in addition to advertising on streaming online content, television, and social media advertisement.

87.    In many of its marketing materials, Kalshi admits its products are gambling. Kalshi and its marketing referred to "sports betting," used betting language (e.g., "bet," "odds," "you can bet on that"), and promoted messages such as "Sports Betting Legal in all 50 States on Kalshi" and "You can now bet on sports in all 50 states with Kalshi."

88.    Kalshi's own "Press" page on its website includes various news stories featuring Kalshi's CEO referring to the offerings as "bets".

---

[10] Kalshi Ideas Profile, KALSHI HELP CTR., https://help.kalshi.com/account/kalshi-ideas-profile (last visited September 23, 2025).

89.    Kalshi's "App Store" thumbnails (i.e., small images featuring the app) have made statements such as "**You can bet on that**" and "**Legal in 50 states.**"

90.    Kalshi made these false statements despite the fact that unlicensed sports wagering is prohibited in every state, and sportsbook operating that is licensed is heavily regulated at the state level when permitted.

91.    Kalshi made its false sports betting claims and disseminated them through website/app store placements, Instagram (e.g., @kalshi_official, @Kalshi'sports), TikTok, and other advertising:



92.    Kalshi's Instagram advertisements have made statements including "The First Nationwide Legal Sports Betting Platform" and "You can now bet on sports in all 50 states with

Kalshi," evidencing Kalshi's strategy to operate and market like a gambling entity rather than a risk management platform:



93.     In a March 2025 advertisement, Kalshi also promoted "Betting on March Madness in all 50 states".  Comments and interactions on social media reflected confusion and concern over whether Kalshi's product was betting or trading and whether such conduct was actually legal nationwide.

94.     The Robinhood integration amplified these messages by surfacing Kalshi contracts inside a mainstream investment app heavily used by retail consumers.

**4.** **Once Potential Customers Arrive on the Kalshi Gambling Websites,**
**They Are Repeatedly Assured that Kalshi Is Operating Legally.**

95.     On its website, Kalshi assures prospective and existing customers that sports betting is now legal in all 50 states.

96.     But while Kalshi is registered with the Commodity Futures Trading Commission, that does not render sports gambling through its website legal in all fifty states. Kalshi's promises to consumers that its sports gambling is legal are misleading.

97.     For example, on a page titled "How is Kalshi Regulated?", Kalshi makes no reference to any relevant gambling regulations or the ongoing legal challenges to Kalshi is facing, in California, Massachusetts, or any other state in the United States.[11]

98.     Instead, Kalshi notes that it is "regulated by the Commodity Futures Trading Commission (CFTC) – an independent agency of the US government that has regulated US derivatives markets since 1974 and is overseen by Congress. Kalshi is regulated as a Designated Contract Market (DCM), which is a financial exchange designated to trade futures, swaps, and/or options on commodities."[12]

99.     Kalshi misleadingly assures customers, by claiming: "Kalshi is regulated by a US Federal regulatory authority helps reassure users that they are engaging with a platform that adheres to the highest standards of operation and accountability."[13]

**5.** **Kalshi's Design Encourages Repeated Risk-Taking.**

100.    Kalshi's user interface emphasizes potential payouts in green while reducing the visual salience of cost/odds; it displays real-time tickers, "people are buying" prompts, leaderboards, and public profiles with performance stats and countdown clocks—design choices that gamify participation, encourage rapid, repeated transactions, and fuel social comparison. These features parallel known behavioral hooks of digital gambling platforms.

---

[11] https://help.kalshi.com/kalshi-101/how-is-kalshi-regulated
[12] https://help.kalshi.com/kalshi-101/how-is-kalshi-regulated
[13] https://help.kalshi.com/kalshi-101/how-is-kalshi-regulated

6.     **Kalshi Employs Only Minimal Safeguards Employed to Prevent Gambling Abuse**

101.    Kalshi provides no safeguards to prevent widespread addiction, financial ruin or risk of loss, or provide education to users that the supposed "event contracts" constitute a form of highly addictive gambling.

102.    Kalshi allows anyone to open an account and start placing bets, after entering basic personal information, so long as the individual is at least 18 years old and can provide a single verifying document.

103.    Kalshi also did not uniformly implement robust geolocation/age-verification, self-exclusion, or helpline placements required of licensed operators.

104.    Kalshi only recently added a monthly deposit "Personalized Funding Cap" as of March 2025—without comprehensive wager limits or cool-off tools typical of regulated sports wagering.

105.    Additionally, Kalshi's risk warnings were hard to locate behind continuously updating home-page content.

106.    Kalshi does not provide any resources or information to a bettor who is seeking responsible gambling messaging or help for financial loss or gambling addiction.

107.    Even if a bettor voluntarily self-excludes from Kalshi, there is no indication whether that bettor would automatically be removed from all Kalshi marketing lists.

7.     **Kalshi's Unlicensed Sports Event Contracts Harm Proposed Class Members Given the Public Health Risks Associated with Gambling**

108.     Gambling has serious public health risks that may lead to harm to a gambler's financial, emotional, and physical well-being, as well as the well-being of their families and communities. Studies show that legalized sports gambling, and especially online sports gambling, harms individuals, families, and communities.

109.    The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM 5-TR") categorizes gambling disorder as an "addictive disorder,"

making it the only defined behavioral addiction in that manual. The disorder includes symptoms such as an increased tolerance for gambling (*i.e.,* more money wagered over time); repeated unsuccessful efforts to control, reduce, or stop gambling; and lying or concealing the extent of gambling involvement.

110.    A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. . . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems.[14]

111.    "[N]ot only does sports betting lead to increased betting activity, but it also leads to higher credit card balances, reduced available credit, decreased net investments in financial markets, and greater participation in lottery play. These effects are particularly pronounced among financially constrained households."[15]

112.    Research further shows that "legalized sports betting amplifies emotional cues, as evidenced by increased [intimate partner violence] when a fan's home team unexpectedly loses."[16] Notably, states that allowed online gambling saw close to three times the decline in credit scores than states that allowed gambling, but not online. Auto loan delinquencies and use of debt consolidation loans also increased.

113.    Several US studies report that those with gambling disorder had the highest suicide rate of any addiction disorder, with one in five having attempted suicide.

---

[14] A Review of Sports Wagering & Gambling Addiction Studies Executive Summary, NAT'L COUNCIL ON PROBLEM GAMBLING, https://www.ncpgambling.org/wp-content/uploads/2023/09/Sports-gambling_NCPGLitRvwExecSummary.pdf (last visited Sept. 22, 2025).
[15] Scott R. Baker et al., Gambling Away Stability: Sports Betting's Impact on Vulnerable Households, Oct. 21, 2024, https://mitsloan.mit.edu/sites/default/files/inline-files/Session3_Paper3_Gambling%20Away%20Stability.pdf.
[16] Kyutaro Matsuzawa & Emily Arnesen, Sports Betting Legalization Amplifies Emotional Cues & Intimate Partner Violence (Oct. 30, 2024) available at https://ssrn.com/abstract=4938642 or http://dx.doi.org/10.2139/ssrn.4938642.

114.    In addition, experts suggest that the pressures that sports betting puts on college athletes may be a contributing factor to the rise in suicidality for this group.

115.    Despite these harms, online gambling companies exploit vulnerable consumers through "[s]ystems of rewards and punishments in online gambling products are designed to encourage continued use and attention, additional payments, or other behaviors that are not always beneficial to the user[.]"[17] This often takes the form of push notifications to users' phones or promotions such as "free" bets or sweepstakes entries, or limited time increased payments to encourage users to continue to gamble.

116.    Kalshi is facilitating gambling in California, nationwide, and/or in every state that provides consumer remedies for unlawful gambling, without any regulatory oversight, exposing residents in every state to gambling addiction without any safeguards.

**C.    Kalshi's Gambling Website Unlawfully Enables Gambling in New York.**

117.    Despite being headquartered in New York, operating from New York, and offering sports betting from and within New York, Kalshi has not registered with the New York Gaming Commission. The Commission's website lists the entities that have registered (Bally Bet, BetMGM, Caesars Sportsbook, DraftKings Sportsbook, ESPN Bet, Fanatics Sportsbook, FanDuel Sportsbook, Resorts World Bet, and Rush Street Interactive), and Kalshi is not among them. http://gaming.ny.gov/sports-wagering.

118.    Given Kalshi has not obtained a license, Kalshi has not completed numerous steps New York requires sports betting platforms to complete prior to authorization, and fails to be regulated by the New York Commission.  For example, New York requires sports betting mobile platforms to pay a one-time fee, adopt appropriate safeguards to ensure that authorized sports betters are physically located within the state when engaging in mobile sports wagering, and

---

[17] Gainsbury, *et al*., *Reducing Internet Gambling Harms Using Behavioral Science: A Stakeholder Framework.* Front. Psychiatry 11:598589 (2020) (noting that mobile gaming companies' tactics, driven by sophisticated machine learning models, are highly effective at capturing attention but may also exploit individuals with addictive tendencies by encouraging continued or escalated gambling. The authors advise that these targeted mechanisms must be carefully managed and regulated, as they pose a substantial risk when not balanced with protective measures.).

prohibits minors from participating. *See* N.Y. PML §§ 1367-a(2)(a), 1367-a(2)(b), 1367-a(3), 1367-a(4)(a)(ii), 1367(1)(a).

119.    Thus, Kalshi's gambling platform is unlawful under New York law because Kalshi enables users to place wagers and bets on sporting events. *See* New York General Obligations Law Section 5-401 ("Illegal wagers, bets and stakes. All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."); Section 5-411 ("Contracts on account of money or property wagered, bet or staked are void. All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in section 5-401, shall be void."); Section 5-419 ("Property staked may be recovered. Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."); Section 5-421 ("Losers of certain sums may recover them. Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof.")

120.    Accordingly, under New York's version of the Statute of Anne, Plaintiff and the Proposed Class may "sue for and recover the money or value" lost to Kalshi for sports betting within three calendar months of the filing of this lawsuit.

**D.    Kalshi's Gambling Website Unlawfully Enables Sports Wagering in California**

121.    Kalshi makes its contract wagers freely accessible to the public in the United States through its website and its mobile apps, including in California.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

122.    Kalshi does not even attempt to reconcile its offerings with California's ban on sports wagering.

123.    Although Kalshi addresses the "numerous risks associated with trading on Kalshi" in its membership agreement, no such disclaimers can be found on the public-facing wager regarding the fact that certain states prohibit sports gambling, including but not limited to California. *See e.g*, Kalshi Membership Agreement, KALSHI, https://kalshi.com/docs/kalshi-member-agreement.pdf (last visited Oct. 16, 2025). Indeed, the agreement does not even use the word "gambling."

124.    Despite Kalshi calling its product "event contracts," consumers are placing wagers on the outcome of sporting events.

125.    Kalshi's sporting event contracts constitute unlawful gaming because Kalshi "deals, plays, or carries on, opens, or causes to be opened" and "conducts, either as owner or employee" and acts by taking a "bank or percentage", and allowing individuals to play or bet, in violation of California Penal Code Section 330.

126.    Kalshi's offering meets the definition of a "wager" under Section 337 because a user risks a sum of money (i.e. the price of the contract) on an uncertain occurrence in a sporting event (i.e. the position taken on the event contract) for the chance to win money if the event takes place (i.e. a prize). CAL. PENAL CODE § 337a(a)(4).

127.    Kalshi's sporting event contracts concern a "a contest" by which Kalshi offers a bet or wager, related to "skill, speed or power of endurance of [a] person", or, "between persons…or mechanical apparatus. CAL. PENAL CODE § 337a(a)(6).

128.    Accordingly, Kalshi's sport events contracts are wagers on uncertain outcomes, structured and operated in a manner that meets the legal definition of sports wagering under California law.

129.    For example, one of Kalshi's offerings display a binary option of a winner of a contest, the perceived likelihood of either option winning, and a price on either option determined by that perceived likelihood.  Kalshi pays out to the winner and nothing to the loser.

130.    Such bets are moneyline wagers, which is "a wager or agreement between two or more people that if an uncertain future event happens, the loser will pay money to the winner or give the winner something of value. A bet includes a wager made on the outcome of any actual or purported event, including but not limited to any kind of sporting contest."  CALCRIM No. 2993, Receiving or Holding Bets (CAL. PENAL CODE § 337a(a)(3)) (cleaned up).

131.    In August 2025 and September of 2025, Kalshi expanded its sports-contract offerings by launching new wager types that are clearly "bets" and "wagers". CAL. PENAL CODE § 337a(a)(6).

132.    One new wager type is framed as follows: "[w]ill <team> win <game> by <above/below/between/exactly/at least> <count> points?"  This is a point spread bet, which is a bet on the difference in score between teams in a game. Kalshi titles the contract "FOOTBALLSPREAD."

133.    Another new wager type asks "[w]ill <game> have <over/under> <count> points in <time period> of <game>?" This is an "over/under" wager, which is a bet on whether the total amount of points scored in a game is over or under a specific amount.

134.    A third new wager type asks the bettor "[w]ill <player/team> score <first/last/any/count> touchdown(s) in  of <game>?" This structure resembles a proposition bets, which are bets on specific events that are not the outcome of a game.

135.    In September of 2025, Kalshi further introduced the following wager to its portfolio: "Will <outcomes> occur in <events>?" designed for bets on multiple "components" which, if each prevail, "will pay out the product of the payouts for each <component>, as dictated by each corresponding <rule>, rounded down to the nearest cent." This structure is a parlay, which is a bet on whether a combination of different events will occur.[18]

---

[18] KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <outcomes> occur in <events>?" Contract, Commodity Futures Trading Commission (Sep. 2, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

136.    Moreover, Kalshi's wagering structure, including the ability to sell wagers to other users and the matching of buyers on opposite sides of a contract constitutes "exchange wagering." Exchange wagering allows bettors to bet or trade against one another rather than a "house".

137.    In addition, Kalshi offers the ability to wager on sporting events while those events are taking place.

138.    Put simply, the outcomes of the contests are contingent and unknown at the time the bets and wagers are collected and recorded (i.e., booked) by Kalshi. And as a result, Kalshi's contests violate California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j.[19]

**E.    Kalshi Targets States that Prohibit Sports Betting**

139.    Kalshi's advertisements are disseminated through website/app store placements, Instagram, TikTok, and other advertising directed to California residents.

140.    Kalshi purchases advertisements on Meta platforms, including Facebook and Instagram, to specifically target states that have not legalized sports betting, including California and Texas.

141.    For example, Kalshi posted the following advertisement regarding California:

---

[19] Plaintiff notes that he is specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make his allegations in the alternative, and accordingly, alleges that the gambling contests offered in California by Kalshi constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



142.    Kalshi also posted the following advertisement regarding Texas:



143.    Besides California and Texas, Kalshi targeted other states by reposting text messages promoting the legality of sports betting in specific states where sports gambling is not legal, including but not limited to Georgia, Minnesota, and Washington.[20]

**F.    Kalshi Fails to Warn Consumers of Ongoing Legal Challenges to Its Sports Betting Operations**

---

[20] Kalshi Is Advertising That 'Sports Betting' Is Legal In California, Texas, Dustin Gouker, https://nexteventhorizon.substack.com/p/kalshi-is-advertising-sports-betting-legal-in-california-texas (last visited Oct. 16, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

144.     As previously referenced, Kalshi is regulated by the Commodity Futures Trading Commission (CFTC), but fails to adequately warn consumers that Kalshi is facing numerous legal challenges to their offering of sports wagering bets online.

145.     Multiple state regulators have taken the position that Kalshi's sports-event contracts constitute unlicensed sports wagering, issuing cease-and-desist directives in several jurisdictions, even as Kalshi's public messaging asserted nationwide legality. Filings report that online sports betting is associated with elevated risks of compulsive gambling and financial harm, underscoring the importance of regulatory safeguards that Kalshi has not adopted.

146.     In July 2025, three California tribes filed suit in the Northern District of California against Kalshi and Robinhood. The tribes allege that Kalshi's event contracts constitute unlicensed sports betting on tribal lands, in violation of the Indian Gaming Regulatory Act (IGR), state law, and tribal gaming compacts. Kalshi has also been sued in Maryland, Nevada, New Jersey, Massachusetts, and Wisconsin.

147.     On August 1, 2025, the District Court for the District of Maryland denied Kalshi's motion to enjoin the Maryland Lottery and Gaming Control Commission from pursuing civil and criminal enforcement of Maryland's gaming laws against Kalshi for offering sports-event contracts in Maryland without registering as a sports wagering licensee. *See KalshiEX LLC v. Martin, et al.*, No. 25-cv-1283-ABA (D. Md. Aug. 1, 2025) (Memorandum Opinion by Judge Adam B. Abelson). The court held that Kalshi failed to show a likelihood of success on the merits of its claim that the Commodity Exchange Act preempts Maryland's gaming laws.

**G.     No Adequate Remedy at Law.**

148.     Plaintiff and the Classes have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of Defendants' violation of law and wrongful conduct alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and class members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the

standard that governs damages. As such, the Court may award restitution even if it determines that Plaintiffs fail to sufficiently adduce evidence to support an award of damages. Further, damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds have grown far greater than the legal rate of interest would recognize. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

149.    Equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his use of the Gambling Websites is determined to be an amount less than paid to use the Gambling Websites. Without compensation for the full amount paid, Plaintiff would be left without the remedy he is entitled in equity.

### H.    Kalshi Acted with Malice, Oppression, and Fraud.

150.    As detailed in this Complaint, Kalshi has acted with malice, oppression, and fraud.

151.    Kalshi acted with malice because, among other reasons and as otherwise detailed in this Complaint, Kalshi's conduct was despicable and was done with a willful and knowing disregard of the rights of the public, Plaintiff, and the Class (as defined below). Kalshi knew (or should have known) that its gambling operations in California were illegal, but despite that induced Plaintiff and the Class to gamble and lose money through its Gambling Website while in California. As the California legislature has repeatedly made clear, "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

152.    Kalshi's conduct was oppressive because, among other reasons and as otherwise detailed in this Complaint, it was despicable and subjected Plaintiff and the Class to cruel and unjust hardship in knowing disregard of their rights, including by falsely inducing them to lose significant sums of money through the illegal gambling enterprise that Kalshi held out as being legal in California.

153.    Kalshi's conduct was fraudulent because, among other reasons and as otherwise detailed in this Complaint, Kalshi intentionally misrepresented and concealed the true nature of its unlawful gambling enterprise from Plaintiff and the Class by affirmatively representing that the Gambling Website and associated contests were legal when Kalshi knew (or should have known) that such contests were not.

## NAMED PLAINTIFF'S FACTS

154.    At all times relevant to this action, including at all times since creating an account with Kalshi, Plaintiff Daniel Yee has resided in San Francisco, California.

155.    On or about October 30, 2024, in response to advertisements he saw on social media while residing in San Francisco, California, Plaintiff created an account with Kalshi. Kalshi represented to Plaintiff that the products and services it offered in California were legal.

156.    In particular, on or about November 1, 2024, Plaintiff Daniel Yee viewed advertisements on Instagram for Kalshi during the 2024 Presidential election.

157.    Since that time, Kalshi has continued to represent to Plaintiff, including on the Gambling Website—that its services are legal in California.

158.    In setting up and using his Kalshi account, Plaintiff expressly relied upon Kalshi's representations that the services it provides in California are legal.

159.    If Kalshi had honestly and accurately disclosed the unlawful nature of its gambling operations in California, Plaintiff would not have created an account with Kalshi in California and would not have placed bets while in California through Kalshi's gambling website.

160.    Since November 1, 2024 Plaintiff has lost over $2,000 to Kalshi while in California. Within the past three months, Plaintiff has spent at least $25 on bets with Kalshi.

161.    If Kalshi had not solicited bets and wagers from Plaintiff while representing that such activities were legal (when, unknown to Plaintiff at the time, they in fact were not legal), he would not have made any of those bets or wagers and would not have paid any money to Kalshi.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

162.    In Plaintiff's experience, Kalshi serves as the "house," setting the betting lines, taking bets and wagers from all users, documenting (i.e., "booking") those bets, using its records to determine "winners" and "losers," and eventually paying out the winners.

163.    While Plaintiff has now discontinued the use of Kalshi while in California, he remains interested in online gambling in California, and if it becomes legal, he will continue to gamble online in California. Plaintiff may be tricked by Kalshi in the future into engaging in unlawful gambling in California if Kalshi continues to claim that its practices are legal.

164.    Plaintiff's sole reason for setting up an account with Kalshi and purportedly consenting to Kalshi's terms of service (which he did not review and was not aware he was purportedly agreeing to at the time of account creation or otherwise) was to gain access to the gambling services in California offered by Kalshi that he now understands violate California law.

165.    Said differently, to the extent a contract was formed between Plaintiff and Kalshi, the sole purpose of the contract was to facilitate the unlawful gambling activities that are at issue in this Complaint.

166.    Accordingly, Plaintiff's contract with Kalshi (to the extent any such contract was otherwise ever formed), is void (and was void ab initio) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

## V.    CLASS ALLEGATIONS

167.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure Rule 23, including, without limitation, Sections (b)(1), (b)(2), and (b)(3) of Rule 23.

168.    Plaintiff seeks certification of the following class (the collectively, the "Classes"):

**The Nationwide Class:** All persons in the United States who lost money by making one or more bets on Kalshi.

**The New York Class:** All residents of New York who lost money by making one or more bets on Kalshi.

**The Statute of Anne Multistate Class:** All residents of Statute of Anne States who Lost Money by making one or more bets on Kalshi.

**The California Class:** All residents of California who lost money by making one or more bets on Kalshi.

169. The "Statute of Anne States" means Arkansas (Ark. Code Ann. § 16-118-103), Connecticut (Conn. Gen. Stat. §§ 52-553, 52-554), the District of Columbia (D.C. Code § 16-1702), Florida (Fla. Stat. §§ 849.12, 849.26, 849.29), Illinois (720 Ill. Comp. Stat. 5/28-8), Indiana (Ind. Code § 34-16-1), Kentucky (Ky. Rev. Stat. Ann. §§ 372.020, 372.040), Maryland (Md. Code Ann., Crim. Law § 12-110), Massachusetts (Mass. Gen. Laws ch. 137, § 1), Michigan (Mich. Comp. Laws §§ 730.315(1), 600.2939(1)), New Hampshire (N.H. Rev. Stat. Ann. § 338:3), New Jersey (N.J. Stat. Ann. §§ 2A:40-5, -6), Ohio (Ohio Rev. Code Ann. § 3763.02), Tennessee (Tenn. Code Ann. § 28-3-106), Vermont (9 Vt. Stat. § 3981), Virginia (Va. Code Ann. §11-15), West Virginia (W. Va. Code § 55-9-2); Alabama (Ala. Code § 8-1-150), Georgia (O.C.G.A. § 13-8-3(b)), Minnesota (Minn. Stat. § 541.02), Mississippi (Miss. Code Ann. § 87-1-5), Missouri (Mo. Rev. Stat. § 434.030 et seq.), Montana (Mont. Code Ann. §§ 23-5-131, 23-5-151), New Mexico (N.M. Stat. Ann. § 44-5-1), Oregon (Or. Rev. Stat. § 30.74), South Carolina (S.C. Code Ann. § 32-1-10), South Dakota (S.D. Codified Laws § 21-6-1), Washington (Wash. Rev. Code § 4.24.070), and Wisconsin (Wis. Stat. Ann. § 895.056).

170. The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

171.    Kalshi's practices have resulted in actual injury and harm to the Class members in the amount of deposits made with Kalshi and/or losses incurred on the Gambling Websites.

172.    Plaintiff explicitly reserves his right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

173.    **Numerosity.** Plaintiff is informed and believes that there are hundreds of thousands or potentially millions of members of the Classes. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the Class can be determined from information in the possession and control of Kalshi.

174.    **Commonality.** Kalshi has acted or refused to act on grounds that apply generally to the Classes. Absent certification of the Classes, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Kalshi and/or Plaintiff and the Classes. Numerous common issues of fact and law exist, including, without limitation:

   a.    Whether Kalshi violated the New York Racing, Pari-Mutuel Wagering and Breeding Law;

   b.    Whether Plaintiffs and each member of the Class lost money or anything of value under New York law;

   c.    Whether Kalshi violated sections 5-419 and -521 of the New York General Obligation Law;

   d.    Whether Kalshi violated section 349 of New York's General Business Law;

   e.    Whether the representations by Kalshi made about sports betting and/or sports gambling in New York were or are true, or are misleading, or likely to deceive;

   f.    Whether Kalshi violates California's laws criminalizing gambling;

   g.    Whether Kalshi's representations that its practices are legal are misleading;

   h.    Whether Kalshi's conduct violates public policy;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

i.      Whether Kalshi engaged in false or misleading advertising;

j.      Whether Kalshi's conduct constitutes violations of the laws asserted herein;

k.      Whether the sports betting contracts are void;

l.      Whether Plaintiff and the other Class members have been injured and the proper measure of their losses as a result of injuries; and

m.      Whether Plaintiff and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

175.    **Predominance.** These common issues predominate over individualized inquiries in this action because Kalshi's liability can be established as to all members of the Class as discussed herein.

176.    **Typicality.** Plaintiff's claims against Kalshi and experience with Kalshi are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiff's claims arise from Kalshi's practices that are applicable to the entire Class.

177.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel that are competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Classes, as Plaintiff and each member of the Classes lost money to Kalshi. Plaintiff also does not have any interests antagonistic to those of the Classes, and Kalshi has no defenses unique to Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the Class.

178.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Classes to receive equitable monetary relief; the equitable monetary relief suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings;

many members of the Classes may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and their counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

179.    Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## VI.    <u>CAUSES OF ACTION</u>

### A.    First Cause of Action: Violation of N.Y. Gen. Oblig. Law § 5-419 (on behalf of Plaintiff, the Nationwide Class, and the New York Class)

180.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

181.    Section 5-419 of the New York General Obligations Law states that, "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

182.    Plaintiff deposited money into accounts created and owned by Defendants for the purpose of engaging in unlawful betting and/or wagering.

183.    Defendants were engaged in an unlawful enterprise wherein consumers paid to participate in unlawful betting and/or wagering.

184.    Upon information and belief, Defendants operated their enterprise out of New York. Defendants processed online consumer payments in New York. Defendants' user agreements include a New York choice-of-law clause.

185.    Pursuant to § 5-419, Plaintiff, the Nationwide Class, and the New York Class have a right to recover from Defendants the monies deposited as part of Defendants' unlawful betting and/or wagering enterprise.

**B.    Second Cause of Action: Violation of N.Y. Gen. Oblig. Law § 5-421 (on behalf of Plaintiff, the Nationwide Class, and the New York Class)**

186.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

187.    Section 5-421 of the New York General Obligations Law states that, "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

188.    Within the past three months, Plaintiff deposited at least twenty-five dollars into accounts created and owned by Defendants for the purpose of engaging in unlawful betting and/or wagering.

189.    Plaintiff lost the money they deposited by engaging in Defendant's unlawful betting and/or wagering games.

**C.    Third Cause of Action: Violation of N.Y. Gen. Bus. Law § 349 (on behalf of Plaintiff, the Nationwide Class, and the New York Class)**

190.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

191.    New York General Business Law section 349 establishes that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

192.    New York General Business Law section 349 applies to Defendant because Defendant engages in consumer conduct by, *inter alia*:

      a.    Providing an online platform wherein consumers pay to participate in illegal wagering and betting;

      b.    employing individuals in furtherance of its business;

    c.      soliciting individuals to become consumers of its product; and

    d.      Obtaining consumers' money in furtherance of its business.

193.    Defendants violated section 349 by, *inter alia*, misrepresenting the sports betting games they offer as legal gambling, when Kalshi really offered illegal unlicensed gambling.

194.    Defendants' conduct was material because it was likely to deceive reasonable consumers about the probability of winning their games, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior.

195.    Defendants willfully misled Plaintiff, the Nationwide Class, and the New York Class, and induced them to rely on their misleading statements and/or omissions.

196.    Defendants accepted money from Plaintiff, the Nationwide Class, and the New York Class to participate in unlawful wagering or betting.

197.    Accordingly, Plaintiff, the Nationwide Class, and the New York Class acted reasonably in relying on Defendants' misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

198.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded the rights of Plaintiff, the Nationwide Class, and the New York Class.

199.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff, the Nationwide Class, and the New York Class have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

200.    Plaintiff, the Nationwide Class, and the New York Class seek all monetary and non-monetary relief allowed by law.

**D.**    **Fourth Cause of Action: Unjust Enrichment (on behalf of Plaintiff and the Classes).**

201.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

202.    Plaintiff and the Classes conferred benefit upon Defendants by paying Defendants to participate in their unlawful betting and wagering scheme.

203.    Defendants appreciated or had knowledge of the benefits they received from Plaintiff and the Classes.

204.    Plaintiff and the Classes reasonably understood that Defendants offered lawful consumer-to-consumer services under New York and other applicable states' laws.

205.    Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering services that were not properly advertised or permitted by law.

206.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of the benefits conferred.

207.    Plaintiff and the Classes have no adequate remedy at law.

208.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**E.    Fifth Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, ("UCL") (on behalf of Plaintiff and the California Class).**

209.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

210.    Kalshi, Plaintiff, and the California Class are "persons" within the meaning of the UCL.

211.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

212.    Kalshi's' practices of operating a Gambling Website within California are "unlawful" within the meaning of the UCL because, among other things, the operation of a Gambling Website violates California Penal Code Sections 319, 320, 321, 330, 330a, 337a, and 337j because, among other reasons, in the course of business and in the course of trade and commerce, Kalshi's has:

a.   Operated illegal lotteries and/or games of chance in violation of Penal Code Sections 319, 320, 321, 330a, and 337j by operating a Gambling Website and contests in California.[21]

b.   Operated banking and/or percentage gambling games in violation of Penal Code Section 330 by operating a Gambling Website and contests in California.

c.   Engaged in pool selling in violation of Penal Code Section 337(a)(1) by operating a Gambling Website and contests in California.

d.   Engaged in bookmaking in violation of Penal Code Section 337(a)(1) by operating a Gambling Website and contests in California.

e.   Violated Penal Code Section 337(a)(3) by "receiv[ing], hold[ing], or forward[ing] . . . money . . . staked, pledged, bet or wagered . . upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating a Gambling Website and contests in California.

f.   Violated Penal Code Section 337(a)(4) by "record[ing], or register[ing] any bet or bets, wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported

---

[21] Plaintiff notes that they are specifically authorized by Federal Rule of Civil Procedure Rule 8(d)(2) to make their allegations in the alternative, and accordingly, allege that the gambling contests offered in California by Kalshi constitute games of "chance' for purposes of those Penal Code Sections that prohibit lotteries and/or other games of chance, and constitute games of skill, to the extent skill is found to be a necessary element of certain claims made under Penal Code Section 337a or otherwise.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

result, of any lot, chance, casualty, unknown or contingent event whatsoever" by operating a Gambling Website and contests in California.

g.    Violated Penal Code Section 337(a)(6) by "[o]ffer[ing] or accept[ing] any bet or bets, or wager or wagers, upon the result . . . of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" by operating a Gambling Website and contests in California.

213.    Kalshi's operation of the Gambling Website and contests within California is also unlawful within the meaning of the UCL because Kalshi has violated the CLRA, as alleged in the Sixth Cause of Action, and violated Penal Code section 496(a), as alleged in the Seventh Cause of Action, below.

214.    Kalshi's operation of a Gambling Website and contests within California is also unlawful within the meaning of the UCL because Kalshi has violated the California Business and Professions Code, because "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

215.    The acts and practices of Kalshi as alleged herein also constitute "unfair" business acts and practices under the UCL because Kalshi's conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Kalshi's conduct outweighs any conceivable benefit of such conduct.

216.    Kalshi has, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into believing the operation of a Gambling Website and contests are lawful in California, when in fact, they are not, causing Plaintiff and the Class to be tricked out tens if not hundreds of millions of dollars.

217.    Plaintiff and the California Class have suffered injury in fact—in the form of all amounts paid to Kalshi and/or the total of net losses on a Gambling Website run by Kalshi for bets

placed within California—as a result of Kalshi's unlawful and unfair business acts and practices and are at substantial risk of continuing to lose money and to be injured by those acts and practices if the practices are not enjoined.

218.    Plaintiff seeks all available equitable remedies under the UCL. Specifically, Plaintiff and the Class seek an order providing equitable restitution and/or equitable disgorgement in the form of all amounts paid to Kalshi by Plaintiff and the California Class and/or the total of net losses on the Gambling Website by Plaintiff and the Class for bets placed within California, and/or residents of states that allow gambling loss recoveries.

219.    Plaintiff further seeks an equitable order enjoining the unlawful practices in California.

220.    Plaintiff and the Class further seek their attorneys' fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this equitable claim.

**F.    Sixth Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*, (on Behalf of Plaintiff and the California Class).**

221.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

222.    At all relevant times, Plaintiff and the California Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

223.    Kalshi's actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the terms of the CLRA, namely the selling of the unlawful gambling goods and services that are at issue in this action through a Gambling Website.

224.    Kalshi violated the CLRA by, among other things:

    a.    "Misrepresenting the source, sponsorship, approval, or certification of goods or services" (a)(2);

b.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

c.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" (a)(5);

d.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (a)(7);

e.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14);

f.    "Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction" (a)(17); and

g.    "Inserting an unconscionable provision in the contract" (a)(19).

h.    Kalshi's actions and misrepresentations were material, and Kalshi's violations of the CLRA were a substantial factor in causing Plaintiff and the Class to lose money.

i.    As a direct and proximate consequence of these actions, Plaintiff and the Class suffered injury.

225.    Kalshi's conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiff and the California Class for Defendants' own benefit to the detriment of Plaintiff and the California Class.

226.    The CLRA provides robust enforcement tools for consumers, including:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a.    Prohibiting the waiver of any substantive rights provided for under the CLRA. *Id.* § 1750

b.    Requiring that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

c.    Establishing a substantive right to litigate in the forum where the transaction occurred and/or where the consumer lives. *Id.* § 1780(d).

d.    Establishing a substantive right to pursue class claims. *Id.* § 1781; *see also id.* § 1752.

e.    Authorizing injunctive relief. *Id.* § 1780(a)(2)

f.    Authorizing actual damages. *Id.* § 1780(a)(1).

g.    Authorizing restitution of unlawfully taken sums. *Id.* § 1780(a)(3).

h.    Authorizing punitive damages. *Id.* § 1780(a)(4).

i.    Authorizing statutory damages of $1,000 per violation. *Id.* § 1780(a)(1).

j.    Authorizing statutory damages of $5,000 per injured individual, where the unlawful conduct was directed against the elderly or the disabled. *Id.* § 1780(b)(1).

k.    Requiring that the Court "shall award court costs and attorney's fees to a prevailing plaintiff in litigation." *Id.* § 1780(e).

227.    Plaintiff seeks all available remedies under the CLRA, except that, at this time, Plaintiff does not seek any monetary damages for his CLRA cause of action.[22]

---

[22] Pursuant to Section 1782(d) of the CLRA, Plaintiff expressly reserves his right to amend the CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, and statutory damages, at least 30 days after providing Defendants the notice contemplated by Section 1782(a).

G.      **Seventh Cause of Action: Violation of Penal Code section 496(c) (on Behalf of Plaintiff and the California Class).**

228.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as if fully set forth herein.

229.    As alleged above, Kalshi's advertisements induced Plaintiff to wager significant amounts of money via the Gambling Websites on the false pretense that Defendants' sports betting platform was legal in California. Defendants' purpose in making these false pretenses was to illegally take money from Plaintiff and the California Class.

230.    Pursuant to California Penal Code section 496(a), receiving property "that has been obtained in any manner constituting theft" is a criminal offense punishable by imprisonment. Pursuant to California law, procuring funds by false pretenses constitutes a violation of Section 496(a). Pursuant to Section 496(c), any person that violates Section 496(a) is liable for three times the actual damages as well as attorney's fees.

231.    Defendants' conduct alleged above constitutes a violation of Penal Code section 496(a), entitling Plaintiff to the relief provided by Section 496(c), including treble damages and reasonable attorney's fees.

## VII.   <u>JURY TRIAL DEMAND</u>

*Plaintiff demands a trial by jury.*

## VIII.  <u>PRAYER FOR RELIEF</u>

232.    Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

A.      Certifying the proposed Class pursuant to Rule 23, appointing Plaintiff as Class Representative, and appointing Plaintiffs' counsel as Class Counsel;

B.      Awarding damages, including nominal, punitive, consequential, and all other damages that the Court may deem appropriate;

C.      Awarding equitable relief, including injunctive relief and monetary relief such as equitable restitution and/or equitable disgorgement;

D.      Providing for any and all other relief the Court deems appropriate;

E.      Awarding Plaintiffs their reasonable costs and expenses of suit, including all attorneys' fees available under the relevant laws;

F.      Awarding pre- and post-judgement interest on any equitable monetary recovery to extent allowed at equity; and

G.      Providing such further equitable relief as this Court may deem just and proper.


 Respectfully submitted,


Dated: October 16, 2025

By: /s/ James Bilsborrow
James Bilsborrow (JB8204)
**WEITZ & LUXENBERG PC**
700 Broadway
New York, NY 10003
Telephone: 212-344-5461
E-mail: jbilsborrow@weitzlux.com

Michael Piggins, *pro hac vice* to be filed
**WEITZ & LUXENBERG PC**
3011 W. Grand Blvd., Fl. 24
Detroit, MI 48202
Telephone: 231-366-3108
E-mail: mpiggins@weitzlux.com

Margot P. Cutter, *pro hac vice* to be filed
Charles B. Stevens, *pro hac vice* to be filed
**CUTTER LAW, P.C.**
401 Watt Ave.
Sacramento, CA 95864
(916) 290-9400
Email: mcutter@cutterlaw.com

-47-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Email: cstevens@cutterlaw.com

Wesley M. Griffith, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA 90802
Telephone: 310-896-5813
E-mail: wes@almeidalawgroup.com

F. Peter Silva II, *pro hac vice* to be filed
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 510-588-5299
E-mail: psilva@tzlegal.com

Katherine M. Aizpuru, NY Bar No. 5305990
Robert M. Devling, *pro hac vice* to be filed
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: 202-973-0900
E-mail: kaizpuru@tzlegal.com
E-mail: rdevling@tzlegal.com

Christopher Nienhaus, *pro hac vice* to be filed
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave
Chicago, IL 60614
Telephone: 708-529-5418
E-mail: chris@almeidalawgroup.com

*Counsel for Plaintiff and the Proposed Classes*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL