**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL YEE, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>      *v.*<br><br>KALSHIEX LLC, KALSHI INC., KALSHI KLEAR LLC, KALSHI KLEAR INC., KALSHI TRADING LLC, and DOES 1-20<br><br>                Defendants. | Case No. 25-cv-8585-JLR |

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'</u>**
**<u>MOTION TO COMPEL ARBITRATION AND, IN THE ALTERNATIVE, TO DISMISS</u>**
**<u>PURSUANT TO RULE 12(b)</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

I.  FACTUAL BACKGROUND ........................................................................ 3

    A.  Event Contracts Are a Recognized Financial Tool to Mitigate Risk, and When Traded on a DCM, Subject to the Exclusive Jurisdiction of the CFTC .......................................................................................................... 3

    B.  Kalshi Operates a DCM That Allows Users to Trade Event Contracts ................. 4

II.  PLAINTIFF'S CLAIMS ARE SUBJECT TO MANDATORY ARBITRATION .......... 5

    A.  Statement of Facts Relevant to Motion to Compel Arbitration ........................... 5

        1.  Before Trading on KalshiEX, Users Are Notified of, and Required to Agree to, the Terms of the KalshiEX User Agreements ....................... 5

        2.  The User Agreements Provide That All Claims Against Kalshi Are Resolved by Binding Arbitration ................................................. 6

        3.  Plaintiff Neglected His Agreement to Arbitrate ....................................... 7

    B.  Legal Standard Relevant to Motion to Compel Arbitration ................................. 8

    C.  Plaintiff's Claims Are Subject to Mandatory Arbitration ..................................... 9

        1.  Plaintiff Entered into a Valid Agreement to Arbitrate His Claims ............ 9

        2.  Plaintiff's Claims Are Within the Scope of the Arbitration Agreement ...................................................................................... 13

        3.  Equitable Estoppel Requires Arbitration of Plaintiff's Claims Against All Defendants ............................................................... 14

III.  IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY ..................................................................................... 15

    A.  Plaintiff Lacks Article III Standing Because He Has Not Suffered an Injury in Fact ................................................................................. 16

    B.  Plaintiff's Claims Are Preempted by the CEA ................................................. 17

        1.  The CEA Expressly Preempts State Regulation of a DCM ..................... 19

        2.  State Law Purporting to Regulate DCMs Is Field Preempted by the CEA .............................................................................. 20

a.     The text of the CEA shows Congress's intent to occupy the field of regulation of transactions executed on DCMs ............... 20

b.     The legislative history of the CEA shows Congress's intent to occupy the field of regulation of transactions executed on DCMs .................................................................................... 22

3.     Plaintiff's Claims Are Expressly Preempted and Impliedly Preempted under the Doctrine of Field Preemption ............................ 25

a.     California Penal Code § 496 is preempted .................. 25

b.     Application of New York's Loss Recovery Act (§ 5-419 and § 5-421) is preempted ........................................... 26

c.     Plaintiff's other state law claims are preempted ........................ 26

4.     Plaintiff's Claims Are Also Conflict Preempted ..................................... 27

C.     Plaintiff's New York Loss Recovery Act Claims Must Be Dismissed (Counts I-II) ................................................................................................ 30

1.     Plaintiff Lacks Standing to Pursue Claims under the Loss Recovery Act ....................................................................................... 31

2.     The Complaint Fails to Adequately Allege the Necessary Elements of Any Claim under § 5-419 or § 5-421 ..................................... 32

a.     Defendants are not winners or stakeholders under § 5-419 or § 5-421 ..................................................................... 32

b.     Event contracts are not unlawful gaming under § 5-419 or § 5-421 ............................................................................ 35

(1)     Event contracts are not bets on "games of chance" under § 5-421 ............................................. 35

(2)     Event contracts are not unlawful bets under § 5-419 or § 5-421 ....................................................... 36

c.     Plaintiff fails to allege any specific transactions under § 5-419 or § 5-421 ........................................................................... 37

D.     Plaintiff Fails to State a Claim Under N.Y. Gen. Bus. Law § 349 (Count III) .............................................................................................................. 38

1.     Plaintiff Lacks Standing to Bring a GBL § 349 Claim ............................ 38

2.      Plaintiff Does Not Allege That He Saw Any Deceptive
        Advertisements ........................................................................ 39

3.      Plaintiff Fails to Allege an Actual Injury................................. 40

4.      Plaintiff Does Not Allege That the Advertisements Were
        Misleading................................................................................ 41

E.      Plaintiff's California-Law Claims Must Be Dismissed ....................... 42

1.      California Law Prohibits Plaintiff from Recovering Alleged
        Gambling Losses....................................................................... 42

2.      Plaintiff Fails to Plead Claims Under California Law (Counts V-
        VII) With the Particularity Required by Rule 9(b) ................... 43

3.      Plaintiff's Unfair Competition Law Claim (Count V) Also Fails
        Because Kalshi's Platform is Not Unlawful or Unfair ............. 44

4.      Plaintiff Fails to State a Claim Under California's Consumer Legal
        Remedies Act (Count VI) ......................................................... 47

5.      Plaintiff Fails to State a Claim Under California Penal Code
        § 496(c) (Count VII) ................................................................ 48

F.      Plaintiff Fails to State a Claim for Unjust Enrichment (Count IV) ..................... 48

CONCLUSION................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
    307 F.3d 24 (2d Cir. 2002)..................................................................................8

*Aiello v. Queens Cnty. Jockey Club*,
    144 N.Y.S.2d 322 (Sup. Ct. 1955)...........................................................36, 37

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992) ...................................................... *passim*

*In re Am. Express Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011)...............................................................................8

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
    2025 WL 2782591 (N.D. Cal. Sep. 30, 2025) ........................................43

*Arizona v. United States*,
    567 U.S. 387 (2012)................................................................................28, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................15

*Astra Oil Co. v. Rover Navigation, Ltd.*,
    344 F.3d 276 (2d Cir. 2003)............................................................................15

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986)....................................................................................9, 14

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)............................................................................................8

*Bell Atl. Co. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................................16

*Bermudez v. Colgate-Palmolive Co.*,
    667 F. Supp. 3d 24 (S.D.N.Y. 2023).............................................................49

*Bettan v. Geico Gen. Ins. Co.*,
    745 N.Y.S.2d 545 (2d Dep't 2002)................................................................50

*Betts v. Bache*,
    1862 WL 4032 (N.Y. Super. Ct. 1862)........................................................37

*Beverage v. Apple, Inc.*,
    320 Cal. Rptr. 3d 427 (Ct. App. 2024) .......................................................44

*Bibbo v. Dean Witter Reynolds, Inc.*,
    151 F.3d 559 (6th Cir. 1998) ...................................................................27, 28

*Blue Lake Rancheria v. Kalshi Inc.*,
    2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) .........................................25

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003)............................................................................41

*Brady v. Anker Innovations Ltd.*,
    2020 WL 158760 (S.D.N.Y. Jan. 13, 2020) ...........................................44

*Braynina v. TJX Cos., Inc.*,
    2016 WL 5374134 (S.D.N.Y. Sep. 26, 2016)...........................................41

*Brilliant v. Raidy*,
    70 N.Y.S.2d 126 (Mun. Ct. 1947)........................................................31, 34

*Caplan v. Dollinger*,
    2025 WL 1808530 (S.D.N.Y. June 30, 2025) .........................................49

*Carr v. State*,
    221 N.Y.S.2d 636 (Ct. Cl. 1961) ...............................................................36

*Catalano v. BMW of N. Am., LLC*,
    167 F. Supp. 3d 540 (S.D.N.Y. 2016).......................................................17

*CFTC v. Am. Metals Exch. Corp.*,
    775 F. Supp. 767 (D.N.J. 1991) .................................................................18

*Chi. Mercantile Exch. v. SEC*,
    883 F.2d 537 (7th Cir. 1989) ......................................................................23

*Chiste v. Hotels.com L.P.*,
    756 F. Supp. 2d 382 (S.D.N.Y. 2010)........................................................39

*Choctaw Generation Ltd. v. Am. Home Assurance Co.*,
    271 F.3d 403 (2d Cir. 2001)........................................................................14

*Clark v. Incomm Fin. Servs.*,
    Inc., 2024 WL 3005905 (C.D. Cal. May 30, 2024) ................................49

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
    58 F.3d 16 (2d Cir. 1995)............................................................................14

*CompuCredit Corp. v. Greenwood*,
    565 U.S. 95 (2012)...........................................................................................8

*Conway v. Conway*,
  24 N.Y.S. 261 (Sup. Ct. 1893) ........................................................................... 26

*Core Focus Consulting 2, LLC v. RenewAge Energy Sols., Inc.*,
  2024 WL 3403115 (C.D. Cal. July 12, 2024) ..................................................... 43

*Corsello v. Verizon New York, Inc.*,
  967 N.E.2d 1177 (N.Y. 2012) ....................................................................... 48, 49

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ........................................................................... 18, 21, 28

*Cross v. Sam Katz Distinctive Tours, Ltd.*,
  338 N.Y.S.2d 717 (Civ. Ct. 1972) ....................................................................... 33

*CXS Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993) ........................................................................................... 18

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*,
  923 F.2d 245 (2d Cir. 1991) ............................................................................... 14

*Davitashvili v. Grubhub Inc.*,
  131 F.4th 109 (2d Cir. 2025) ....................................................................... 10, 11

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) ............................................................................................. 9

*Derbaremdiker v. Applebee's Int'l, Inc.*,
  2012 WL 4482057 (E.D.N.Y. Sep. 26, 2012) ..................................................... 41

*Doe v. Epic Games, Inc.*,
  435 F. Supp. 3d 1024 (N.D. Cal. 2020) ............................................................. 48

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ....................................................................... 13

*Dorris v. Danone Waters of Am.*,
  711 F. Supp. 3d 179 (S.D.N.Y. 2024) ................................................................ 39

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
  31 N.Y.3d 441 (2018) ......................................................................................... 50

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) ........................................................................ *passim*

*ELT Sight, Inc. v. EyeLight, Inc.*,
  2021 WL 6618552 (C.D. Cal. Oct. 22, 2021) ............................................... 43, 48

*Emerson Elec. Supply Co. v. Estes Express Lines Corp.*,
    451 F.3d 179 (3d Cir. 2006)..................................................................24

*Fahrner v. Tiltware LLC*,
    2015 WL 1379347 (S.D. Ill. Mar. 24, 2015) ......................................34

*Fairbanks v. Superior Ct.*,
    205 P.3d 201 (Cal. 2009) ...................................................................47

*Federkowitz v. Holoweak*,
    168 N.Y.S. 4 (App. Term 1918) .........................................................33

*Feld v. Postmates, Inc.*,
    442 F. Supp. 3d 825 (S.D.N.Y. 2020)...................................11, 12, 13

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)............................................................................18

*Fischer v. Rosenthal & Co.*,
    481 F. Supp. 53 (N.D. Tex. 1979) ......................................................21

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*,
    65 F.4th 851 (6th Cir. 2023) ...............................................................18

*Formic Ventures LLC v. SomaLogic, Inc.*,
    2023 WL 6037899 (N.D. Cal. Sep. 15, 2023) ....................................48

*Fortune Limousine Serv., Inc. v. Nextel Commc'ns*,
    826 N.Y.S.2d 392 (2d Dep't 2006).....................................................50

*Frank v. Delta Airlines Inc.*,
    314 F.3d 195 (5th Cir. 2002) ..............................................................22

*Frenzel v. AliphCom*,
    76 F. Supp. 3d 999 (N.D. Cal. 2014) ..................................................44

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) ...........................................................23

*Garcia v. Nabfly, Inc.*,
    2024 WL 1795395 (S.D.N.Y. Apr. 24, 2024).....................................10

*Gen. Elec. Co. v. Metals Res. Grp. Ltd.*,
    741 N.Y.S.2d 218 (1st Dep't 2002) ....................................................37

*Georgia Malone & Co. v. Rieder*,
    973 N.E.2d 743 (N.Y. 2012)...............................................................48

*Gillespie v. St. Regis Residence Club, N.Y. Inc.*,
  343 F. Supp. 3d 332 (S.D.N.Y. 2018) ...................................................................49

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
  8 F. Supp. 3d 467 (S.D.N.Y. 2014) .....................................................................39

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
  774 N.E.2d 1190 (N.Y. 2002) ..............................................................................38

*Haft v. Haier US Appliance Sols., Inc.*,
  578 F. Supp. 3d 436 (S.D.N.Y. 2022) ..................................................................38

*Hastings v. Nifty Gateway, LLC*,
  724 F. Supp. 3d 241 (S.D.N.Y. 2024) ..................................................................11

*Hesse v. Godiva Chocolatier, Inc.*,
  463 F. Supp. 3d 453 (S.D.N.Y. 2020) ..................................................................17

*Hi Tech Trans, LLC v. New Jersey*,
  382 F.3d 295 (3d Cir. 2004) .................................................................................21

*Hofmayer v. Dean Witter & Co., Inc.*,
  459 F. Supp. 733 (N.D. Cal. 1978) ......................................................................24

*Hu v. Whaleco, Inc.*,
  779 F. Supp. 3d 265 (E.D.N.Y. 2024) ......................................................11, 12, 13

*Humphrey v. Viacom, Inc.*,
  2007 WL 1797648 (D.N.J. June 20, 2007) ...........................................................34

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ..............................................................................................23

*Int'l Trading Ltd. v. Bell*,
  262 Ark. 244 (Ark. 1977) ......................................................................................24

*Intercontinental Hotels Corp. (Puerto Rico) v. Golden*,
  203 N.E.2d 210 (N.Y. 1964) .................................................................................32

*Jamgotchian v. Sci. Games Corp.*,
  371 F. App'x 812 (9th Cir. 2010) .........................................................................42

*Jones v. B.C. Christopher & Co.*,
  466 F. Supp. 213 (D. Kan. 1979) .........................................................................23

*KalshiEX LLC v. Flaherty*,
  2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...........................................................25

*KalshiEX, LLC v. Hendrick*,
    2025 WL 1073495 (D. Nev. Apr. 9, 2025)...................................................................25

*Kaufman v. Sirius XM Radio, Inc.*,
    474 F. App'x 5 (2d Cir. 2012) .................................................................................39

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .................................................................................43

*Kelly v. First Astri Corp.*,
    84 Cal. Rptr. 2d 810 (Ct. App. 1999) ......................................................................42

*Kern v. Stubhub, Inc.*,
    2024 WL 5283923 (S.D.N.Y. Dec. 17, 2024) ..........................................................12

*Kissling v. Wyndham Vacation Resorts, Inc.*,
    2015 WL 7283038 (N.D. Cal. Nov. 18, 2015) ........................................................47

*Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of N.Y.*,
    269 F. Supp. 2d 424 (S.D.N.Y. 2003)......................................................................37

*KPMG LLP v. Cocchi*,
    565 U.S. 18 (2011).....................................................................................................8

*Kwikset Corp. v. Superior Ct.*,
    246 P.3d 877 (Cal. 2011) .........................................................................................43

*Langworthy v. Broomley*,
    1864 WL 3629 (N.Y. Sup. Ct. 1864) .......................................................................35

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980)......................................................................18, 23, 28

*Lewis v. Casey*,
    518 U.S. 343 (1996)..................................................................................................16

*Lugones v. Pete & Gerry's Organic, LLC*,
    440 F. Supp. 3d 226 (S.D.N.Y. 2020)......................................................................39

*Lujan v. Defs. Of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................16

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012)........................................................................................16

*Manfredonia v. Am. Airlines, Inc.*,
    416 N.Y.S.2d 286 (2d Dep't 1979)...........................................................................31

*Marentette v. Abbott Lab'ys, Inc.*,
    886 F.3d 112 (2d Cir. 2018) ................................................................................ 18

*Marks v. United Parks & Resorts, Inc.*,
    2025 WL 2767941 (S.D. Cal. Sep. 26, 2025) ....................................................... 47

*Mason v. Mach. Zone, Inc.*,
    140 F. Supp. 3d 457 (D. Md. 2015) ..................................................................... 43

*McKell v. Wash. Mut., Inc.*,
    49 Cal. Rptr. 3d 227 (Ct. App. 2006) ................................................................. 46

*Meech v. Stoner*,
    19 N.Y. 26 (1859) ................................................................................................. 36

*Mehler v. Terminix Int'l Co.*,
    205 F.3d 44 (2d Cir. 2000) .................................................................................. 14

*Mendoza v. Levy*,
    90 N.Y.S. 748 (2d Dep't 1904) ............................................................................ 36

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ....................................................................................... 18, 24

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ............................................................................................. 19

*Meyer v. Sprint Spectrum L.P.*,
    200 P.3d 295 (Cal. 2009) .................................................................................... 43

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) .................................................................................. 10

*Miramontes v. Ralph Lauren Corp.*,
    2023 WL 3293424 (S.D.N.Y. May 5, 2023) ................................................... 31, 39

*Mississippi v. Louisiana*,
    506 U.S. 73 (1992) ............................................................................................... 21

*Mrowiec v. Polish Army Veterans Ass'n of Am., Post 124 of Syracuse, N.Y.*,
    73 N.Y.S.2d 361 (Sup. Ct. 1947) .................................................................... 37, 38

*Mullis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    492 F. Supp. 1345 (D. Nev. 1980) ...................................................................... 21

*Nicosia v. Amazon.com, Inc.*,
    384 F. Supp. 3d 254 (E.D.N.Y. 2019) ................................................................. 11

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)..................................................................17

*Ochoa v. Zeroo Gravity Games LLC*,
   2023 WL 4291650 (C.D. Cal. May 24, 2023) ........................................42

*Olson v. Major League Baseball*,
   447 F. Supp. 3d 159 (S.D.N.Y. 2020).....................................................50

*Ossipova v. Pioneer Credit Recovery, Inc.*,
   2019 WL 6792318 (S.D.N.Y. Dec. 11, 2019) ........................................16

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
   647 N.E.2d 741 (N.Y. 1995)..............................................................40, 41

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983)................................................................................20

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
   515 F. Supp. 202 (N.D. Ala. 1981) ........................................................25

*People v. Coates*,
   407 N.Y.S.2d 866 (2d Dep't 1978).........................................................33

*People v. Coppla*,
   224 P.2d 828 (Cal. Dist. Ct. App. 1950).................................................45

*People v. Postma*,
   160 P.2d 221 (Cal. App. Dep't Super. Ct. 1945) ...................................45

*People v. Thompson*,
   24 Cal. Rptr. 101 (Dist. Ct. App. 1962)..................................................45

*Picha v. Gemini Tr. Co.*,
   2024 WL 967182 (S.D.N.Y. Mar. 5, 2024) ..............................................9

*Pilot Life Ins. Co. v. Dedeaux*,
   481 U.S. 41 (1987)..................................................................................20

*Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*,
   795 F.2d 415 (5th Cir. 1986) ..................................................................21

*Pro Water Sol., Inc. v. Angie's List, Inc.*,
   457 F. Supp. 3d 845 (C.D. Cal. 2020) ....................................................46

*Quintana v. B. Braun Med. Inc.*,
   2018 WL 3559091 (S.D.N.Y. July 24, 2018) .........................................40

*Ragone v. Atl. Video at Manhattan Ctr.*,
  595 F.3d 115 (2d Cir. 2010).............................................................................14

*Rice v. Bd. of Trade of Chi.*,
  331 U.S. 247 (1947)..............................................................................23, 29

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)......................................................................................24

*Rojas-Lozano v. Google, Inc.*,
  159 F. Supp. 3d 1101 (N.D. Cal. 2016) ........................................................47

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..........................................................................16

*S.H. v. Diocese of Brooklyn*,
  167 N.Y.S.3d 171 (2d Dep't 2022)...............................................................31

*Saul Stone & Co. v. Browning*,
  615 F. Supp. 20 (N.D. Ill. 1985) ...................................................................24

*Shepherd v. Belkin Int'l, Inc.*,
  683 F. Supp. 3d 282 (E.D.N.Y. 2023) ...........................................................15

*Siry Inv., L.P. v. Farkhondehpour*,
  513 P.3d 166 (Cal. 2022) ..............................................................................48

*Smith v. Intel Corp.*,
  745 F. Supp. 3d 853 (N.D. Cal. 2024) ..........................................................45

*Soc'y of Plastics Indus., Inc. v. Cnty. of Suffolk*,
  573 N.E.2d 1034 (N.Y. 1991)........................................................................32

*Solon v Meuer*,
  539 N.Y.S.2d 241 (Civ. Ct. 1987) .................................................................26

*Sonnenberg v. Oldford Grp., Ltd.*,
  2015 WL 1379505 (S.D. Ill. Mar. 24, 2015) .................................................34

*Stutman v. Chem. Bank*,
  731 N.E.2d 608 (N.Y. 2000)..........................................................................40

*Sullivan v. Fox*,
  235 Cal. Rptr. 5 (Ct. App. 1987)....................................................................45

*Swafford v. Int'l Bus. Machs. Corp.*,
  408 F. Supp. 3d 1131 (N.D. Cal. 2019) .........................................................46

*Thorne v. Square, Inc.*,
    2022 WL 542383 (E.D.N.Y. Feb. 23, 2022)....................................................12

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
    108 F.4th 144 (3d Cir. 2024) ......................................................................21

*Troyer v. Nat'l Futures Ass'n*,
    2017 WL 2971962 (N.D. Ind. July 12, 2017) .................................................19, 27

*United States v. Brien*,
    617 F.2d 299 (1st Cir. 1980) .......................................................................21

*W. Cap. Design, LLC v. N.Y. Mercantile Exch.*,
    180 F. Supp. 2d 438 (S.D.N.Y. 2001)............................................................19

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................17

*Watts v. Malatesta*,
    261 N.Y.S. 51 (1st Dep't 1932) ...............................................................32, 36

*Wilkenfeld v. Attic Club*,
    134 N.Y.S. 507 (Sup. Ct. 1911) ...............................................................35, 36

*Wis. Pub. Intervenor v. Mortier*,
    501 U.S. 597 (1991)..................................................................................18

*Wixon v. Wyndham Resort Dev. Corp.*,
    2008 WL 1777590 (N.D. Cal. Apr. 18, 2008) ...................................................47

*Wright v. Publishers Clearing House, Inc.*,
    372 F. Supp. 3d 61 (E.D.N.Y. 2019) .............................................................39

*Wright v. Publishers Clearing House, Inc.*,
    439 F. Supp. 3d 102 (E.D.N.Y. 2020) ...........................................................39

*Zachman v. Hudson Valley Fed. Credit Union*,
    49 F.4th 95 (2d Cir. 2022) ...........................................................................9

*Zeltner v. Irwin*,
    49 N.Y.S. 337 (1st Dep't 1898) ..............................................................31, 32

## Statutes

7 U.S.C. § 2.................................................................................*passim*

7 U.S.C. § 6c (1940) ...........................................................................22

7 U.S.C. § 7......................................................................................30

7 U.S.C. § 7a-2 ................................................................................................5, 25, 29

7 U.S.C. § 13a-2 ............................................................................................19, 22, 27

7 U.S.C. § 16 ......................................................................................................20, 21

9 U.S.C. § 2 ..................................................................................................................8

9 U.S.C. § 4 ..........................................................................................................1, 9, 14

Cal. Bus. & Prof. Code § 17200 .......................................................................42, 44

Cal. Bus. & Prof. Code § 17204 ...............................................................................43

Cal. Civ. Code § 1750 ...............................................................................................42

Cal. Civ. Code § 1761 ...............................................................................................47

Cal. Civ. Code § 1770 ...............................................................................................42

Cal. Civ. Code § 1780 ...............................................................................................43

Cal. Penal Code § 319 ...............................................................................................45

Cal. Penal Code § 320 ...............................................................................................45

Cal. Penal Code § 321 ...............................................................................................45

Cal. Penal Code § 330 ...............................................................................................45

Cal. Penal Code § 330a .............................................................................................45

Cal. Penal Code § 337a .............................................................................................45

Cal. Penal Code § 337j ..............................................................................................46

Cal. Penal Code § 496 ...............................................................................................42

N.Y. Gen. Bus. Law § 349 .....................................................................................2, 38

N.Y. Gen. Oblig. Law § 5-401 ........................................................................26, 36, 37

N.Y. Gen. Oblig. Law § 5-411 ...................................................................................26

N.Y. Gen. Oblig. Law § 5-419 ........................................................................... passim

N.Y. Gen. Oblig. Law § 5-421 ........................................................................... passim

## Other Authorities

17 C.F.R. pt. 38 ...........................................................................................................4

17 C.F.R. § 38.5 ..........................................................................................................5

17 C.F.R. § 38.150 ......................................................................................................30

17 C.F.R. § 38.151 ......................................................................................................30

17 C.F.R. § 38.200 ......................................................................................................29

17 C.F.R. § 38.600 ......................................................................................................30

17 C.F.R. § 38.1101 ....................................................................................................30

17 C.F.R. § 40.2 ..........................................................................................................5

17 C.F.R. § 40.11 ........................................................................................................5

120 Cong. Rec. 30,464 (Sep. 9, 1974) .......................................................................23

*Commodity Futures Trading Commission Act: Hearings on S. 2485, S. 2578, S.*
    *2837, and H.R. 13113 Before the S.Comm.on Agric. & Forestry,* 93d Cong.,
    2d Sess. (1974) .....................................................................................................23

*Core Principles and Other Requirements for Designated Contract Markets*, 77
    Fed. Reg. 36612  (June 19, 2012) ........................................................................30

Fed. R. Civ. P. 9(b) ....................................................................................................16

Fed. R. Civ. P. 12(b) ....................................................................................................1

H.R. Rep. No. 93-975 (1974) ......................................................................................23

H.R. Rep. No. 93-1383 (1974) ....................................................................................23

H.R. Rep. No. 97-565, pt. 1 (1982) ............................................................................20

Defendants KalshiEX LLC, Kalshi Inc., Kalshi Klear LLC, Kalshi Klear Inc., and Kalshi Trading LLC (collectively, "Defendants" or "Kalshi") respectfully submit this memorandum of law in support of their petition to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4, and, in the alternative, to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b).

## PRELIMINARY STATEMENT

Plaintiff's claims are subject to mandatory arbitration under the terms of the relevant User Agreements (defined below). Plaintiff had clear notice that any action must be resolved by binding arbitration, and repeatedly manifested assent to that term—both at the time he initially created his account and each time he logged into the KalshiEX Platform (defined below). Because this is an action against Kalshi arising out of trades executed by Plaintiff under the terms of the User Agreements, this Court must compel arbitration of Plaintiff's claims under Section 4 of the Federal Arbitration Act. *See* 9 U.S.C. § 4 (if satisfied as to validity of arbitration agreement, "court *shall* make an order directing the parties to proceed to arbitration") (emphasis added).

In the alternative, the Complaint must be dismissed in its entirety. KalshiEX LLC ("KalshiEX") is a CFTC-registered "designated contract market" ("DCM") that offers participants the opportunity to trade event contracts. Event contracts are derivative contracts—swaps—where the payoff is based on the occurrence, nonoccurrence, or the extent of the occurrence of an event. Event contracts have traded on Kalshi's DCM since 2021. In January 2025, Kalshi began offering sports-event contracts. The Complaint relates *only* to Kalshi's sports-event contracts and alleges they constitute unlawful sports gambling under New York and California state law. Plaintiff

asserts that: the sports-event contracts violate New York's Loss Recovery Act[1] (Counts I-II), are deceptive acts or practices under New York law (Count III), and are unlawful or unfair business acts or practices under California law (Counts V-VI); that Kalshi's advertising of sport-event contracts is theft by false pretenses (Count VII); and that Kalshi was unjustly enriched (Count IV).

The Complaint suffers threshold defects that cannot be cured. First, Plaintiff lacks Article III standing because he has not alleged an injury in fact. Plaintiff does not, and could not, allege that he traded any sports-event contracts, or that he lost money on those trades. Second, Plaintiff's claims, which all arise under state law, are preempted by the federal Commodity Exchange Act ("CEA"). All of Plaintiff's claims rely on the (incorrect) premise that Kalshi's event contracts are illegal because Kalshi failed to obtain licenses from state gaming authorities or comply with state law regulating the operation of gambling websites within the state. However, any state statute that purports to regulate Kalshi or the transactions executed on it—for example, by declaring them unlawful—is preempted by the CEA.

Even if Plaintiff could overcome these threshold defects, the Complaint fails to state a plausible claim for relief. Plaintiff is a California resident and claims he was in California at all relevant times. This is fatal to claims under the LRA and New York General Business Law ("GBL") § 349, which cannot be applied extraterritorially. Further, the LRA claims must be dismissed because Plaintiff fails to allege that event contracts are unlawful gaming or that Kalshi was a "winner" or "stakeholder," as required for recovery. Plaintiff's state consumer protection law claims also fail because Plaintiff fails to allege a loss or injury caused by Kalshi. His claims under California law must be dismissed for the additional reason that California public policy bars

---

[1] "Loss Recovery Act" or "LRA" refers to New York General Obligations Law §§ 5-419 and 5-421.

claims seeking recovery of gambling losses.  And Plaintiff's duplicative unjust enrichment claims must be dismissed because Plaintiff fails to demonstrate that Kalshi has unjustly retained any benefit.

## I.    FACTUAL BACKGROUND[2]

### A.    Event Contracts Are a Recognized Financial Tool to Mitigate Risk, and When Traded on a DCM, Subject to the Exclusive Jurisdiction of the CFTC

Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract—they are a type of swap.  This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2026.  A purchaser may trade on either the "yes" or the "no" position on the contract.  If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house."  Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return.

The CEA provides a comprehensive regulatory framework governing derivatives. The CEA grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction"

---

[2] Citations to "¶ __" are to paragraphs of the Complaint.  ECF No. 1.

over transactions traded or executed on a DCM.  7 U.S.C. § 2(a)(1)(A); *see infra* Section III.B.1 (describing CEA savings clause and the scope of CFTC's exclusive jurisdiction).

**B.    Kalshi Operates a DCM That Allows Users to Trade Event Contracts**

KalshiEX is a CFTC-registered DCM.  ¶¶ 96, 98.  Kalshi Inc. is the parent company of KalshiEX, and all other Defendants, which are affiliates of one another.  ¶¶ 7, 10.  KalshiEX is Kalshi's consumer-facing offering, and users of the platform can enter into swap contracts with other users.  The specific swaps at issue here are known as event contracts which allow users to buy "yes" or "no" positions on the outcome of specific events, such as whether an unemployment rate reported by the Bureau of Labor Statistics will exceed a certain percentage.[3]  *See* ¶ 51.  Some of Kalshi's offerings are sports-event contracts, such as which team will win the Super Bowl.[4] ¶ 63.  Event contracts have traded on Kalshi's DCM since 2021, and it began offering contracts related to sports in January 2025.  ¶¶ 60, 63.  The "exclusive jurisdiction" of the CFTC under the CEA specifically extends to "transactions involving swaps . . . traded or executed on a contract market designated" under the CEA, such as Kalshi's DCM.  7 U.S.C. § 2(a)(1)(A).

As a CFTC-registered exchange, Kalshi is subject to the CEA's comprehensive regulatory scheme.  Both the CEA and agency regulations subject Kalshi to ongoing oversight by the CFTC and require its DCM to comply with 23 "Core Principles," which include strict monitoring, recordkeeping, and reporting requirements aimed at protecting market integrity.  17 C.F.R. pt. 38. Before listing any event contract for trading, Kalshi must certify that the contract complies with the CEA and applicable regulations, among other things.

---

[3] *See* ¶ 60; U3 Event Contract, KalshiEX LLC,  https://kalshi-public-docs.s3.amazonaws.com/contract_terms/U3.pdf (last visited Jan. 18, 2026).

[4] *See, e.g.*, Achievements Event Contract, KalshiEX LLC, https://kalshi-public-docs.s3.amazonaws.com/contract_terms/NFL.pdf (last visited Jan. 18, 2026).

Once a DCM certifies compliance, an event contract is available for trading unless and until the CFTC finds that the product violates the CEA or its regulations. *See* 17 C.F.R. § 40.2(a). The CFTC may disapprove any event contract that it finds is noncompliant, and it also has discretion to delist any contracts in certain enumerated categories—***including gaming***—that it determines to be "contrary to the public interest." *See* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(c). The Commission can place a contract under a 90-day review to evaluate whether it is contrary to the public interest, during which period the trading of such a contract is suspended. 17 C.F.R. § 40.11(c). Thus, while Kalshi is permitted to self-certify compliance, the CFTC retains the ultimate authority to approve or disapprove any event contract. The CFTC also may require a DCM to submit a "Demonstration of Compliance" at any time, in the form of "a written demonstration, containing supporting data, information and documents," affirming that its offerings are "in compliance" with one or more Core Principles, or showing that the DCM is complying with the CEA. *Id.* § 38.5(b). The Complaint does not, and could not, allege that any of Kalshi's sports-related event contracts have ever been placed under review or suspended by the CFTC. Accordingly, these contracts are legal under federal law and subject to exclusive regulatory jurisdiction of the CFTC.

## II. PLAINTIFF'S CLAIMS ARE SUBJECT TO MANDATORY ARBITRATION

### A. Statement of Facts Relevant to Motion to Compel Arbitration

#### 1. Before Trading on KalshiEX, Users Are Notified of, and Required to Agree to, the Terms of the KalshiEX User Agreements

Users can access KalshiEX through the web via Kalshi's website or through a mobile application available on certain smartphones (the "KalshiEX Platform"). Sottile Decl. ¶ 6.[5] Before

---

[5] Citations to "Ex. _" refer to the exhibits attached to the Declaration of Xavier Sottile ("Sottile Decl.").

trading on the KalshiEX Platform, participants are required to create an account and agree to the terms and conditions of accessing the KalshiEX Platform, including those contained in KalshiEX's Member Agreement ("Member Agreement") and KalshiEX's Rulebook ("Rulebook"), as well as its Privacy Policy, Trading Prohibitions, and the rulebook and participant agreement for Kalshi's designated clearing organization, Kalshi Klear LLC (collectively, the "User Agreements").  *Id.* ¶¶ 8, 13.

Specifically, as part of the registration process, each Kalshi user must first select whether they wish to sign up with Google, Apple, or email.  *Id.* ¶¶ 10, 15.  Immediately below these options is a notice stating: "By continuing, you acknowledge and agree to Kalshi's legal terms, **which we recommend reviewing**."  *Id.* ¶¶ 11-13.  The entire registration prompt is displayed clearly on one screen.  *Id.*  The text of the notice links to a pop-up window containing links to each of the User Agreements.  *Id.*

Even after users have created a KalshiEX account, they are prompted to review and agree to the terms of the User Agreements each time they log into the KalshiEX Platform.  *Id.* ¶ 21. Participants cannot execute any trades on the KalshiEX Platform unless they are signed into their accounts.  *Id.* ¶ 23.  It is not possible to execute any trades as a "guest" on the KalshiEX Platform.  *Id*.

### 2.    The User Agreements Provide That All Claims Against Kalshi Are Resolved by Binding Arbitration

The Member Agreement notifies users of the obligation to arbitrate claims against KalshiEX.  Section VII, titled "Member Acknowledgements," provides: "You will abide by and be subject to the language of the Rulebook, as now existing and as hereafter duly amended from time to time **including the obligation to submit to arbitration**."  Ex. 2 at VII.A (emphasis added). The "Governing Law" section of the Member Agreement further provides that "[a]ny dispute

between Kalshi and You arising from or in connection with this Agreement will be settled in accordance with the procedures set forth in the Kalshi Rulebook." *Id.* at XX. The Member Agreement also incorporates the Rulebook by reference, advises the user to review all documents incorporated by reference, and notifies the user that entering the KalshiEX Platform is the "legal equivalent of manually signing and agreeing to be bound by this agreement." Sottile Decl. ¶ 32; Ex. 2 at 1.

The Rulebook contains the terms and conditions pursuant to which a user may engage in trading. *See, generally,* Ex. 1. The Rulebook contains a hyperlinked table of contents at the front of the document, including a link to Chapter 11.3, titled "Limitations of Liability." *Id.* at ch. 11.3. By clicking on the Chapter 11.3 link, a user is immediately directed to several provisions governing the circumstances under which a user could bring an action against or recover from KalshiEX. Section 11.3(d) states:

> EACH PARTICIPANT OF KALSHI AGREES THAT ANY ACTION IT BRINGS AGAINST A KALSHI PARTY . . . WILL BE RESOLVED BY BINDING ARBITRATION, IN ACCORDANCE WITH THE RULES OF THIS CHAPTER.

*Id.* at ch. 11.3(d).[6] Other provisions of Chapter 11.3 address the governing law and limitations on damages and timing of recovery. Sottile Decl. ¶¶ 25-26.

### 3. Plaintiff Neglected His Agreement to Arbitrate

Plaintiff alleges he created a KalshiEX account in or around November 2024. ¶ 156. As of that date, the registration and sign-in procedures for the KalshiEX Platform were as described *supra* II.A.1. Sottile Decl. ¶ 9. Furthermore, KalshiEX's records indicate that, since November 2024, Plaintiff logged into his KalshiEX account no fewer than ***71 times***. *Id.* ¶ 22. And, each time

---

[6] "Kalshi Party" is defined as KalshiEX and "its officers, directors, agents, employees, and/or software, hardware, and service providers." Ex. 1 at Ch. 11.3(a).

he logged in, Plaintiff would have been notified that, "[b]y continuing, you acknowledge and agree to Kalshi's legal terms, **which we recommend reviewing**." *Id.* Accordingly, Plaintiff was on inquiry notice of the arbitration provision in the Rulebook requiring Plaintiff to arbitrate any claims against KalshiEX and manifested his assent to those terms when he created his account and each time he logged into the platform. *See infra* II.A.2. Nevertheless, in neglect of his obligation to arbitrate any claim against KalshiEX, Plaintiff brought this case, on behalf of himself and four putative classes, in federal court. ¶¶ 1, 168.

### B.    Legal Standard Relevant to Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") applies to any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. "Agreements to arbitrate that fall within the scope and coverage of the Federal Arbitration Act . . . must be enforced in state and federal courts." *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) (per curiam).[7] When "deciding whether claims are subject to arbitration" under New York law, courts in the Second Circuit "consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). Where both elements are met, the Court must compel arbitration according to the agreement's terms. *See, e.g.*, *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 34-36 (2d Cir. 2002).

The FAA reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344-46 (2011) (citations omitted). Courts must "enforce [arbitration] agreements . . . according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98

---

[7] Unless otherwise indicated, all citations have been "cleaned up."

(2012).  The FAA creates "a presumption of arbitrability" and all "[d]oubts should be resolved in favor of [arbitration]."  *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).  Where a valid arbitration clause exists, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

Once a moving party shows the existence of an agreement to arbitrate, "the burden shifts to the party seeking to avoid arbitration to 'show the agreement to be inapplicable or invalid.'"  *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 102 (2d Cir. 2022) (citation omitted).

### C.   Plaintiff's Claims Are Subject to Mandatory Arbitration

Plaintiff entered into a valid agreement to arbitrate with KalshiEX when he received notice of, and agreed to, the terms of the Member Agreement and Rulebook, including the mandatory arbitration provision contained therein.  The arbitration provision to which Plaintiff agreed is broad and encompasses all claims against KalshiEX.  The terms and conditions that governed Plaintiff's use of the KalshiEX Platform were conspicuous on KalshiEX's registration and sign-in screens, and Plaintiff manifested his assent to those terms when he proceeded to create an account and each time he logged into the KalshiEX Platform.  Accordingly, this Court must enter an order directing the parties to arbitrate these claims.  *See* 9 U.S.C. § 4.

### 1.   Plaintiff Entered into a Valid Agreement to Arbitrate His Claims

Determining whether an online terms-of-use agreement, like the User Agreements, creates a valid agreement turns on whether "(1) a reasonably prudent person would be on inquiry notice of the terms and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent."  *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023).  Even where the non-moving party denies actual notice of the terms of a contract, a person is on "inquiry notice" of the terms of an online agreement if the reasonably prudent user

would have been on notice of the terms. *Picha v. Gemini Tr. Co.*, 2024 WL 967182, at *8 (S.D.N.Y. Mar. 5, 2024); *see also Davitashvili v. Grubhub Inc.,* 131 F.4th 109, 115-16 (2d Cir. 2025). "While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice." *Garcia v. Nabfly, Inc.*, 2024 WL 1795395, at *8 (S.D.N.Y. Apr. 24, 2024) (citation omitted).

In the context of an online terms-of-use agreement, "reasonably prudent" is an objective standard that presumes the plaintiff has "some familiarity with how to navigate a website or download an app." *Edmundson*, 85 F.4th at 704 ("[S]uch a user is not a complete stranger to computers or smartphones."). Where the internet or smartphone user does not explicitly say "I agree" to the contractual terms, the Court may consider the "design and content of the relevant interface," including: "(1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms . . . ; (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at time when the consumer would expect to receive such terms . . . ; and (3) the course of dealing between the parties, including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms." *Id.* at 704-05.

Contract terms are conspicuous when they "are linked on an 'uncluttered' interface and temporally and 'spatially coupled with the mechanism for manifesting assent,'" where the user "does not need to scroll beyond what is immediately visible to find the terms." *Id.* at 704; *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). Courts routinely find that a "sign-in wrap," which is where a website interface is "designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login

10

process," is sufficient to put a user on inquiry notice of an arbitration provision contained in such terms. *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 829 (S.D.N.Y. 2020); *see Hastings v. Nifty Gateway, LLC*, 724 F. Supp. 3d 241, 248-49 (S.D.N.Y. 2024) (enforcing arbitration agreement where website's sign-up page stated that by "signing up, you agree to the Terms and Conditions and Privacy Policy"); *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 269-70 (E.D.N.Y. 2019) (hyperlink under sign-up button containing terms and conditions document bound users to arbitration clause). Similarly, the Second Circuit has upheld arbitration provisions where the link is placed near a "register" or "continue" button that the user has to click in order to proceed with their transaction on the website. *See, e.g.*, *Davitashvili*, 131 F.4th at 115-17.

Two illustrative examples: In *Edmundson*, the Second Circuit found that users of the Klarna widget interface were on "reasonably conspicuous notice" where users were presented with a screen which contained the hyperlinked statement "I agree to the payment terms" and a button marked "Confirm and continue." 85 F.4th at 699. Similarly, in *Hu v. Whaleco, Inc.*, 779 F. Supp. 3d 265, 289 (E.D.N.Y. 2024), the court held that users of an online shopping mobile application were on inquiry notice of the terms and conditions on the application's registration screen. The court reasoned that the registration screen was uncluttered because it only presented one field for users to enter details, two links (one to the terms and one to the privacy policy), and five buttons to either register for a new account or to connect to four types of pre-existing accounts. *Id.* at 289. The court found that the hyperlinks and text reading "[b]y continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**" put users on inquiry notice because the dark grey font of the hyperlink was reasonably conspicuous, the hyperlinks and notice were visible on the same screen, and both the notice and hyperlinks were "temporally coupled" with the user's initial transaction of creating an account. *Id.* at 274, 290-91.

Here, KalshiEX's sign-up screen satisfies the reasonable notice standard.  As in *Edmundson* and *Hu*, Kalshi's account creation and sign-in screens are uncluttered.  *See* Sottile Decl. ¶¶ 12, 21.  The notice that account creation requires assent to Kalshi's terms, and the hyperlink to the User Agreements, are visible on the same page as the "continue" button, which the user must select in order to proceed with creating an account.  *See id.* ¶¶ 14-17.  Because Kalshi users cannot register for, or sign into, an account without encountering the terms, the notice and hyperlink are "temporally coupled."  *See, e.g.*, *Edmundson*, 85 F.4th at 705-07; *Hu*, 779 F. Supp. 3d at 283-92.  Similarly, users are reminded of, and re-assent to, Kalshi's legal terms each time they sign into the KalshiEX Platform, and the notice and hyperlink to the User Agreements are similarly visible on a single page.  *See* Sottile Decl. ¶ 21.

By accepting the User Agreements, Plaintiff unambiguously manifested his assent to the terms contained therein.  Courts regularly hold that a user who "signs in" or "clicks through," where the notice of terms and conditions conspicuously appears on the page, has unambiguously manifested their assent when they choose to continue.  *See, e.g.*, *Feld*, 442 F. Supp. 3d at 831 (users manifested assent when the "physical proximity of the [hyperlinked agreement] to the register button and the placement of the language in the registration flow make clear to the user that the linked terms pertain to the action the user is about to take"); *Thorne v. Square, Inc.*, 2022 WL 542383, at *8 (E.D.N.Y. Feb. 23, 2022) (users unambiguously manifested assent to the hyperlinked terms by the "Continue" button when they were on inquiry notice and pressed "Continue"); *Kern v. Stubhub, Inc.*, 2024 WL 5283923, at *2 (S.D.N.Y. Dec. 17, 2024) (inquiry notice in combination with some action "such as clicking a button or checking a box"

12

unambiguously manifests consent to the hyperlinked terms of sign-wrap agreements); *see also Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) (similar).[8]

The court's decision in *Feld* is instructive. There, the court found that users manifested consent to the terms of service—including the arbitration provision therein—where the link to those conditions appeared below the email and password fields and above the "Sign Up" and sign-up with "Facebook" buttons. 442 F. Supp. 3d at 832. Like in *Feld*, when Plaintiff created an account on the KalshiEX Platform, and each time he signed in thereafter, he was provided notice that "[b]y continuing, you acknowledge and agree to Kalshi's legal terms, **which we recommend reviewing**" and provided the opportunity to review the terms. Sottile Decl. ¶¶ 12, 21. And, as in *Feld*, the sign-in button is in close proximity to the hyperlinked text. *Id.* ¶ 21. In other words, the terms and conditions are presented in a location and time at which Plaintiff would have expected to receive such terms. *See, e.g.*, *Edmundson*, 85 F.4th at 707-08; *Hu*, 779 F. Supp. 3d at 293. Accordingly, Plaintiff manifested consent to the User Agreements, including the Rulebook and its mandatory arbitration provision, when he registered for the KalshiEX Platform.

### 2. Plaintiff's Claims Are Within the Scope of the Arbitration Agreement

The arbitration clause here encompasses Plaintiff's claims. When Plaintiff created an account and traded through the KalshiEX Platform, he agreed:

> EACH PARTICIPANT OF KALSHI AGREES THAT ANY ACTION IT BRINGS AGAINST A KALSHI PARTY OR AGAINST ANOTHER KALSHI MEMBER WILL BE RESOLVED BY BINDING ARBITRATION, IN ACCORDANCE WITH THE RULES OF THIS CHAPTER AND OTHER RULES OF KALSHI, IF APPLICABLE.

---

[8] Users typically expect to receive notice of terms and conditions and hyperlinks on the "initial registration screen." *Hu*, 779 F. Supp. 3d at 294. Downloading an app or signing up for a website clearly contemplates some sort of "continuing relationship between the putative user and the defendant, one that would require some terms and conditions." *Id.* at 295-96 (citation omitted).

Ex. 1 at ch. 11.3(d).  That "is the paradigm of a broad clause," giving rise to "a presumption that [a plaintiff's] claims are arbitrable."  *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (analyzing a clause "submitting to arbitration '[a]ny claim or controversy arising out of or relating to th[e] agreement'").  The Second Circuit routinely upholds similar provisions, such as ones requiring arbitration of "any controversy or claim between [the parties] arising out of or relating to the Agreement," *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 49 (2d Cir. 2000), and of "all disputes arising out of or in relation to" a contract, *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 251 (2d Cir. 1991).

Where arbitration clauses are broad like the one at issue here, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  *AT & T Techs.*, 475 U.S. at 650.  Plaintiff cannot come close to providing such "forceful evidence," as his claims unambiguously fall under the Rulebook's broad arbitration clause.  Accordingly, this Court must enter an order directing the parties to arbitration.  9 U.S.C. § 4.

### 3. Equitable Estoppel Requires Arbitration of Plaintiff's Claims Against All Defendants

The Rulebook provides that claims against KalshiEX are subject to arbitration, but the same applies to all Defendants.  Courts require arbitration of claims against non-signatories to an arbitration agreement where (1) claims against the non-signatories are "intertwined with the agreement," *Choctaw Generation Ltd. v. Am. Home Assurance Co.,* 271 F.3d 403, 406-07 (2d Cir. 2001); and (2) there is a "relationship among the parties of a nature that justifies" estopping a plaintiff from "denying an obligation to arbitrate a similar dispute" with a non-signatory.  *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010).  That is the case here.

*First,* the claims against all Defendants are ***identical*** to those against KalshiEX and based exclusively on Plaintiff's use of KalshiEX.  *See Shepherd v. Belkin Int'l, Inc.*, 683 F. Supp. 3d 282, 288-89 (E.D.N.Y. 2023).  In *Shepherd,* the court required plaintiff to arbitrate its claims against a non-signatory where plaintiff brought identical claims against two defendants and treated both defendants as having made identical misrepresentations, even though the arbitration clause at issue did not expressly reference the non-signatory.  *Id.*  Here, Plaintiff brings the same seven claims for relief against all defendants, *see* ¶¶ 180-231, and "does not distinguish in any way between" Defendants.  *Shepherd*, 683 F. Supp. 3d at 288-89.  Plaintiff refers to all defendant entities collectively as "Kalshi," without distinguishing between corporate entities, and alleges that all Defendants made identical misrepresentations.  *See, e.g.*, ¶¶ 91-92, 100, 141.

*Second*, although all Defendants are corporate affiliates of one another, Plaintiff does not distinguish between Defendants; rather, he pleads that "[i]n concert with the other Kalshi entities, [KalshiEX] operates a prediction market."  ¶ 8.  Courts ordinarily find the relationship between "corporate affiliates, subsidiaries, agents, or other related business entities" to be "of a nature" that justifies compelling arbitration against an affiliate.  *Shepherd*, 683 F. Supp. 3d at 287.  The relationship between KalshiEX and the other Defendants reinforces that Plaintiff should be estopped from denying an obligation to arbitrate a similar dispute with adversaries that are not party to the User Agreements.  *See Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 280-82 (2d Cir. 2003) (estopping respondent from avoiding arbitration with corporate affiliate of signatory).

## III.    IN THE ALTERNATIVE, THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY

 "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Dismissal is

required where the allegations in the complaint "could not raise a claim of entitlement to relief." *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 558 (2007). The court need not accept purely conclusory allegations as true. *Ossipova v. Pioneer Credit Recovery, Inc.*, 2019 WL 6792318, at *2 (S.D.N.Y. Dec. 11, 2019). Further, because Plaintiff's claims here are based on allegations of fraud and malice, they are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[9] Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004).

## A.    Plaintiff Lacks Article III Standing Because He Has Not Suffered an Injury in Fact

To establish standing, a plaintiff must show: (1) an "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992). In a putative class action, standing is determined based on the injury to the named plaintiff, not the uncertified class. *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012). Named plaintiffs who lack standing cannot acquire it through class representation. *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

Here, Plaintiff lacks Article III standing because he has not alleged that he traded any of the sports-event contracts that are the subject of his Complaint. A named plaintiff cannot claim an

---

[9] *See* Compl. at 31 ("Kalshi Acted with Malice, Oppression and Fraud"); ¶ 153 ("Kalshi's conduct was fraudulent. . . ."); *see also* ¶¶ 195, 198, 225.

injury in connection with a product they did not purchase.  *See, e.g., In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 368-69 (S.D.N.Y. 2011); *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 553-54 (S.D.N.Y. 2016).

"[N]on-sports related bets and wagers are outside the scope of this action."  ¶ 60.  Plaintiff does not allege—nor can he—that he ever traded any of Kalshi's sports-event contracts, or that he lost money on those trades.[10]  Without a direct and personal injury related to the challenged conduct, Plaintiff's allegations amount to nothing more than a generalized grievance about the legality of Kalshi's sports-event contracts.  This is insufficient to establish standing.  *Lujan*, 504 U.S. at 573-74.  Therefore, Plaintiff's claims must be dismissed because he has not suffered an "injury in fact" as required by Article III.[11]

### B.    Plaintiff's Claims Are Preempted by the CEA

Plaintiff's claims all rely on the (flawed) premise that Kalshi's event contracts are illegal because Kalshi failed to obtain licenses from state gaming authorities and comply with legal requirements to operate a lawful gambling website within the various states.[12]  Accordingly, Plaintiff cannot recover on any of his claims unless he demonstrates that those state gaming laws apply to Kalshi and that Kalshi failed to comply with them.  But Plaintiff will not be able to do so because state gaming regulations do not apply to transactions executed on a CFTC-registered

---

[10] While Plaintiff claims to have lost $2,000 on trades in his Kalshi account since November 1, 2024, those trades were not based on sports-related events.  ¶¶ 156-60.  Moreover, any losses in 2024 are irrelevant because that was prior to Kalshi offering and advertising sports-related event contracts.  ¶ 63.

[11] Plaintiff also lacks standing to seek injunctive relief because there is no "real or immediate threat" of future injury.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).  A conditional intent to purchase a product in the future does not establish standing.  *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 465 (S.D.N.Y. 2020) (no Article III standing where plaintiffs alleged they were "likely to" purchase products in the future).

[12] *See* ¶¶ 183, 189, 193, 205, 223, 229.

DCM. Any state statute that purports to regulate Kalshi's DCM or the transactions executed on it—for example, by declaring them unlawful—is expressly and impliedly preempted by the CEA.

A "fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). State laws that "interfere with, or are contrary to the laws of congress," are preempted and "invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991); *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859 (6th Cir. 2023). State law preemption by federal law may be express or implied. Express preemption exists where a federal statute expressly so provides. *CXS Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Implied preemption exists when there is field preemption or conflict preemption. Field preemption occurs where Congress indicates an intent to exclusively occupy an entire regulatory field. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Conflict preemption occurs "where compliance with both state and federal law is a physical impossibility, or . . . where the state law at issue stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018).

Courts across the circuits agree that, at a minimum, the CEA preempts state statutes that attempt to regulate the operation of commodity derivatives markets like DCMs. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982); *see also Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (when application of state law would "directly affect trading on or the operations of a futures market," it is preempted); *CFTC v. Am. Metals Exch. Corp.*, 775 F. Supp. 767, 779 (D.N.J. 1991) (the CFTC has exclusive jurisdiction to regulate the "Nation's commodity [derivatives] exchanges"), *rev'd in part on other grounds*, 991 F.2d 71 (3d Cir. 1993).

The CEA expressly restricts the jurisdiction of state authorities from enforcing their laws with respect to transactions subject to the CEA's exclusive jurisdiction.  7 U.S.C. § 2(a)(1)(A).  And, although the CEA does not preempt states from enforcing their "general civil or criminal antifraud statute[s]," 7 U.S.C. § 13a-2(7), this Court, as well as others, has found state fraud-based claims to be preempted by the CEA when they are used to regulate the operation of a DCM.  *See W. Cap. Design, LLC v. N.Y. Mercantile Exch.*, 180 F. Supp. 2d 438, 443 (S.D.N.Y. 2001) (dismissing state fraud claim brought against DCM as preempted by the CEA because the claim implicated the DCM's duties to "self-police and regulate" and "[lay] not on the . . . distinct duties established under the common law, but rather in an Exchange's representations about its federal statutory duties"); *see also Troyer v. Nat'l Futures Ass'n*, 2017 WL 2971962, at *12 (N.D. Ind. July 12, 2017) (same).

### 1.    The CEA Expressly Preempts State Regulation of a DCM

Section 2 of the CEA contains explicit language that the CFTC has "exclusive jurisdiction" over "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  Kalshi's event contracts are "swap" contracts traded on a "contract market designated" by the CFTC, which necessarily denies any state the right to enact and enforce laws intended to regulate conduct on a DCM.  Section 2 also expressly reserves the jurisdiction to regulate "transactions involving swaps" that are "traded or executed on a contract market" for the CFTC, and "supersede[s] [and] limit[s]" the ability of states to enact and enforce laws that do the same.  *Id.*; *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740 (1985) (noting that the presence of a savings clause alongside an express preemption provision delineates the scope of a statute's express preemption provision, because "[w]hile Congress occasionally decides to return to the States what it ha[d] previously taken away, it does not normally do both at the same time").

Other provisions of the CEA reinforce the CFTC's exclusive jurisdiction.  *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987) (looking to "the provisions of the whole law, and to its object and policy" in assessing express preemption).  For example, Section 12(e) of the CEA provides that "[n]othing in the [CEA] shall preempt" application of a state statute to transactions that are "*not conducted on or subject to the rules of a [DCM]*."  7 U.S.C. § 16(e) (emphasis added).  In other words, Section 12(e) acknowledges that the CEA *does* preempt application of state statutes involving a transaction conducted on a DCM, but clarifies that transactions *not* conducted on a DCM are subject to state laws regulating "transactions outside those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 43 (1982).  And the CFTC itself stated in 2024 that "due to federal preemption, event contracts never violate state law when they are traded on a DCM."  Appellant's Brief at 27, *KalshiEX LLC v. CFTC*, 2025 WL 1349979 (D.C. Cir. 2025) (No. 24-5205), 2024 WL 4512583, at *27.

### 2.    State Law Purporting to Regulate DCMs Is Field Preempted by the CEA

Congress's intent "to supersede state law altogether may be found from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it"—this is field preemption.  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983).  In determining whether Congress intended to fully occupy a field, courts look to the pervasiveness of a regulatory scheme, the statutory text, and its legislative history.  *Id.* at 203-12.

### a.    The text of the CEA shows Congress's intent to occupy the field of regulation of transactions executed on DCMs

The CEA's clear mandate that the CFTC retain "exclusive jurisdiction" over all "transactions involving swaps" that are "traded or executed on a [DCM]" is clear textual evidence

of Congress's intent to occupy the field of regulation of transactions executed on a DCM.  *E.g.*, *Crosby*, 530 U.S. at 372 n.6 (recognizing "express" field preemption).

The phrase "'exclusive' necessarily denies jurisdiction" to other entities not named in that provision.  *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992).  The "explicit statutory conferral of exclusive jurisdiction" to a federal authority withdraws "any concurrent jurisdiction" from state authorities "over that same subject matter."  *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024); *accord Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 305 (3d Cir. 2004) (federal statute granting agency "exclusive jurisdiction over 'transportation by rail carrier' . . . preempts state regulation of rail transportation").  Moreover, with respect to the regulation of derivatives, courts have regularly found that the "exclusive jurisdiction" language of the CEA indicates an intent to preempt the field.  *E.g.*, *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation.").[13]

The CEA's grant of exclusive jurisdiction to the CFTC over event contracts traded on DCMs is reinforced by the text of the CEA.  As noted above, the CEA preserves state regulation for commodities and futures contracts traded *outside* of CFTC-approved exchanges.  *See, e.g.*, 7 U.S.C. § 16(e) (providing that "[n]othing in the CEA preempts application of a "[s]tate statute . . .

---

[13] *See also, e.g.*, *Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 419-22 (5th Cir. 1986) (recognizing Congress's intent to preempt the field of futures regulation as established by the text and legislative history of the CEA); *Mullis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 492 F. Supp. 1345, 1350 (D. Nev. 1980) (holding that, "[o]n the basis . . . of the grant of exclusive jurisdiction to the CFTC to regulate commodities . . . the CEA preempts any other state statute dealing with commodity futures trading"); *Fischer v. Rosenthal & Co.*, 481 F. Supp. 53, 56-57 (N.D. Tex. 1979) (recognizing the "exclusive jurisdiction" vested in the CFTC and reasoning that, "[s]ince the [CEA] was first enacted in 1922, the regulation of commodities trading has been governed by federal law, and federal law may be said to have preempted the field").

to any transaction in or involving any commodity . . . that is *not conducted on or subject to the rules of a [DCM]*") (emphasis added).  Similarly, Section 13a-2 authorizes state officials to sue over "any act or practice constituting a violation of any provision of this chapter or any [CFTC] rule."  7 U.S.C. § 13a-2(1).  But states may *only* enforce the CEA against parties "*other than a [designated] contract market*."  *Id.* (emphasis added).  Moreover, Section 2 itself, after defining the scope of the CFTC's exclusive jurisdiction, states that "[e]xcept as hereinabove provided,"— *i.e.*, except with respect to matters subject to the exclusive jurisdiction of the CFTC—"nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State."  7 U.S.C. § 2(a)(1)(A).  In other words, the text of Section 2 reflects that Congress intended to occupy the field of regulation of any activity subject to its exclusive jurisdiction—including swap transactions executed on a DCM.  Congress's decision to define and authorize areas where state regulation can occur, yet repeatedly and uniformly *exclude* regulation of DCMs from those areas, reinforces the general rule that it intended to preempt the field *on* DCMs.  These clauses would "hardly have seemed necessary" if state gambling laws nonetheless applied to regulate conduct on DCMs.  *Frank v. Delta Airlines Inc*., 314 F.3d 195, 199 (5th Cir. 2002).

> **b.** <u>The legislative history of the CEA shows Congress's intent to occupy the field of regulation of transactions executed on DCMs</u>

The legislative history of the CEA also reflects a Congressional intent to occupy the field of regulation of transactions on DCMs.  Indeed, prior to the 1974 amendments, the CEA preserved state law as to "transactions" regulated by the CEA.  7 U.S.C. § 6c (1940).  The Supreme Court had explained that *without* this language, the CEA would "almost certainly conflict with state laws," but that this provision "serve[d] the function of preventing supersedure and preserving state

control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). Senate drafters accordingly "deleted" this clause in the 1974 amendments "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (Sep. 9, 1974) (statement of Sen. Curtis). This is a clear expression that Congress did not intend to preserve state authority to regulate trading on DCMs. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

Congress emphasized one of the goals of the CEA was to "avoid unnecessary, overlapping and duplicative regulation" in the derivatives markets. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). It intended the proposed amendments to bring "the futures markets" "under federal regulation." *Commodity Futures Trading Commission Act: Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113 Before the S.Comm.on Agric. & Forestry,* 93d Cong., 2d Sess. 685 (1974). One Senator added, "different State laws would just lead to total chaos." *Id.* at 685 (statement of Sen. Clark). Drafters later reiterated that regulation should be uniform with "all exchanges . . . under the *same* set of rules." H.R. Rep. No. 93-975, at 76 (1974) (emphasis added). In amending the CEA, Congress expressed a desire to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

In the decades following the 1974 amendments, courts of appeals, district courts, and state supreme courts repeatedly held that "the CEA preempts the application of state law" to trading on DCMs. *Leist*, 638 F.2d at 322; *Ken Roberts*, 276 F.3d at 590-91 (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*") (citation omitted); *Am. Agric. Movement*, 977 F.2d at 1157 (holding state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (similar); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979)

(similar); *Int'l Trading Ltd. v. Bell*, 262 Ark. 244, 250-51 (Ark. 1977) (similar); *see also Saul Stone & Co. v. Browning*, 615 F. Supp. 20, 22-23 (N.D. Ill. 1985) (similar); *Hofmayer v. Dean Witter & Co., Inc*., 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("The congressional intent to preempt state commodities regulation was also made explicit in the legislative history."). As one court found, Congress recognized that "a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Am. Agric. Movement*, 977 F.2d at 1156.

When it again amended the CEA in 2010, Congress was presumably aware of the precedent finding field preemption and the CFTC's exclusive jurisdiction over DCMs. *See Emerson Elec. Supply Co. v. Estes Express Lines Corp*., 451 F.3d 179, 187 (3d Cir. 2006) ("Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend."). Armed with this knowledge, Congress preserved the CFTC's exclusive jurisdiction to regulate transactions on a DCM in the 2010 amendments. And the CFTC recently confirmed that it shares the view that its jurisdiction to regulate transactions on a DCM is exclusive. *See supra* III.B.1.

The comprehensiveness of the regulatory scheme over trading on DCMs confirms that Congress preempted the field. *See Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947) ("The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."). The CEA is "a comprehensive regulatory structure" to oversee the swaps and "futures trading complex," *i.e.*, all DCMs. *Curran*, 456 U.S. at 356. In its "modern, more robust form," the CEA vests the CFTC with "broad powers to administer and enforce the CEA." *Am. Agric. Movement*, 977 F.2d at 1155.

**3.    Plaintiff's Claims Are Expressly Preempted and Impliedly Preempted under the Doctrine of Field Preemption**

Plaintiff's state law claims hinge on a single premise: that trading on Kalshi's exchange is illegal under state law because it represents unlicensed gambling in California, New York, and other states.  But, as discussed, any state law that directly or indirectly regulates a DCM or the transactions executed on such an exchange is preempted by the CEA.

**a.    California Penal Code § 496 is preempted**

Plaintiff's claim under California Penal Code § 496 (Count VII) is preempted.  A state law that purports to disallow or impose criminal penalties on the trading of a sports-event contracts on a federally registered exchange as gaming would be a form of state regulation and contrary to the CFTC's exclusive authority to regulate swaps traded on a DCM, including its sole discretion to permit or limit the trading of such contracts as "gaming."   7 U.S.C. § 2(a)(1)(A); *id.* § 7a-2(c)(5)(C)(i).  Any state law that criminalizes these contracts directly intrudes on the CFTC's exclusive authority to regulate "transactions involving swaps" that are "traded or executed on exchanges that the CFTC has designated under section 7."  *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at \*5, \*6 (D. Nev. Apr. 9, 2025) ("Congress intended to occupy the field of regulating CFTC-designated exchanges, and the transactions conducted on those exchanges."), *vacated on other grounds*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at \*6, \*8 (D.N.J. Apr. 28, 2025) (preliminarily enjoining as preempted the New Jersey Division of Gaming Enforcement's efforts to regulate Kalshi's event contracts as sports wagers under state law); *see also Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at \*1 (N.D. Cal. Nov. 10, 2025) (holding that the CEA governs event contracts over purportedly contrary laws); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 204 (N.D. Ala. 1981) (CEA

preempts "a state gambling statute which purports to void all futures transactions in which delivery of the commodity is not intended"). The CFTC itself agrees. *See supra* III.B.1.

> b. Application of New York's Loss Recovery Act (§ 5-419 and § 5-421) is preempted

Plaintiff's claims under New York's LRA (§ 5-419 and § 5-421, Counts I and II) are preempted. Plaintiff seeks to void and unwind, *en masse* on behalf of a class, all sports-related event contracts traded on Kalshi's exchange, and enjoin any future trading in sports-event contracts. This would effectively end Kalshi's sports-related prediction market business, which was lawfully established pursuant to federal law and is operating under the oversight of the CFTC. Indeed, New York's LRA exists for the sole purpose of supplementing New York's regulation of gambling. *Conway v. Conway,* 24 N.Y.S. 261, 261-62 (Sup. Ct. 1893) (the "right which is thus conferred [under the statute] is designed . . . to furnish an *additional means* for the prevention or discouragement of gambling") (emphasis added).

Moreover, New York's LRA only applies to wagers or betting that is prohibited. *See Solon v Meuer*, 539 N.Y.S.2d 241, 243 (Civ. Ct. 1987) (noting that § 5-419 and § 5-421 "manifest a policy that someone who has been fortunate enough to have made money from a *illegal gambling scheme* must disgorge his winnings to the loser" (emphasis added)). Plaintiff alleges that he can recover under the LRA because the sports-event contracts here are prohibited under N.Y. General Obligations Law § 5-401 and § 5-411. ¶ 119. These laws are preempted for the same reasons discussed above with respect to California Penal Law: the criminalization of contracts traded on a DCM would be a state regulatory encroachment upon the CFTC's exclusive authority.

> c. Plaintiff's other state law claims are preempted

Plaintiff's other claims under GBL § 349 (Count III), California's Unfair Competition Law (Count V), California's Consumer Legal Remedies Act (Count VI), and for unjust enrichment

(Count IV) are likewise preempted.  Although the CEA does not generally preempt state law consumer/fraud causes of action, 7 U.S.C. § 13a-2(7), Plaintiff's claims are all derivative of preempted statutes or, as applied, would result in de facto regulation of a DCM, which is meant to be exclusively reserved for the CFTC.  *Id.* § 2(a)(1)(A); *e.g., Troyer*, 2017 WL 2971962, at *12.

For example, Plaintiff's GBL § 349 claim (Count III) turns on the predicate state-law determination that Kalshi's DCM-traded event contracts are "illegal unlicensed gambling" or otherwise subject to New York's gambling-regulatory standards.  ¶¶ 119, 193.  Plaintiff cannot demonstrate that Kalshi's conduct is unlawful gambling under state law because state gaming regulations do not apply to Kalshi, and the relief Plaintiff seeks would constitute a de facto enforcement action against Kalshi under state law.  *Supra* III.B.3(a)-(b).  A plaintiff cannot end-run the exclusive federal regulation of DCMs in this manner.  Clearly, this is not the type of uniform regulation Congress had in mind when it divested states of their regulatory authority over registered DCMs.  *See Am. Agric. Movement*, 977 F.2d at 1157 ("The crucial inquiry, we reiterate, is the context in which a law is applied.  State laws specifically directed towards the futures markets naturally operate in an arena preempted by the CEA.  Laws of general application of course operate in a variety of arenas, and are preempted only when plaintiffs attempt to use them in a manner that would, in effect, regulate the futures markets.").  Plaintiff's unjust enrichment (Count IV) and California state law claims (Counts V-VII) are no different insofar as they all rest on the legality of Kalshi's event contracts.

### 4.    Plaintiff's Claims Are Also Conflict Preempted

Even if express and field preemption did not apply here, all of Plaintiff's state law claims would be preempted because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as evidenced by the language, structure, and underlying goals of the CEA.  *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563 (6th Cir.

1998); *see also Crosby*, 530 U.S. at 373-74 ("If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.").  Subjecting Kalshi to varying state laws—each of which had the authority to declare its operation of a DCM unlawful—would clearly conflict with the federal exclusive jurisdiction intended by Congress.  A state law deeming an event contract unlawful would be an overt form of state regulation that was exclusively reserved for the CFTC.  In addition, the application of the state laws relied upon by Plaintiff here would "undermine[] the intended purpose and 'natural effect'" of the federal scheme for regulating CFTC-designated exchanges in at least four ways.  *Id.* at 373 (citation omitted).

*First,* application of these state laws to event contracts traded and executed on Kalshi's DCM conflicts with Congress's intent of developing a uniform regulatory scheme for CFTC-registered exchanges and to avoid subjecting such exchanges to conflicting state law regimes.  *Am. Agric. Movement*, 977 F.2d at 1156 (describing the CEA as intending to bring the futures market "under a uniform set of regulations" in response to Congress's fear that "states . . . might step in to regulate the futures markets themselves").  Courts agree that state laws that conflict with the CEA's aim of uniformity are preempted.  For instance, the Sixth Circuit found that an Ohio statute was preempted by the CEA because the statute stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA."  *Bibbo*, 151 F.3d at 563; *see also Am. Agric. Movement*, 977 F.2d at 1156-57; *Leist*, 638 F.2d at 314.

*Second*, application of Plaintiff's claims to sanction a DCM for providing certain swaps "create[s] a conflict in the method of enforcement" selected by Congress.  *Arizona v. United States*,

567 U.S. 387, 406 (2012).  A state law stands as an "obstacle" to a federal regulatory scheme where it adopts a different method of enforcement than that elected by Congress, thereby throwing off-kilter "the careful balance struck by Congress."  *Id*.  In particular, where Congress reserves "discretion" over violations for federal authorities, a state regime that penalizes an individual for the same actions "violates" the well-settled federal scheme.  *Id*. at 409.  The CFTC has the authority to review Kalshi's self-certification of an event contract on the basis that it falls within an enumerated category (including "gaming") and to determine, pursuant to that review, whether the contract is "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CFTC elected not to do so, thereby authorizing Kalshi's event contracts.

Plaintiff's claim that Kalshi's event contracts are illegal under New York and California law would effectively supplant the CFTC's determination on whether a particular event contract constitutes gaming and/or is contrary to public interest, overriding the determination through the application of contrary state law.  That directly conflicts with the exclusive regulatory authority that Congress granted to the CFTC for event contracts traded on a DCM.  Penalizing Kalshi for offering the same contracts that the CFTC has deemed appropriate to list on a federal exchange—which includes all of Kalshi's contracts at issue in this case—would disrupt the scheme.  *Cf. Rice v. Bd. of Trade of Chi.*, 331 U.S. at 253 (holding that the CEA supersedes state laws that interfere with the CFTC's regulatory authority).

*Third*, application of Plaintiff's state law claims to Kalshi would act as an obstacle to the objectives of Congress because it would make a DCM liable for any ordinary losses incurred on its exchange—*simply because the loss occurred*.  This would vastly inflate a DCM's required regulatory capital, make contracts more prone to potential manipulation, and make orderly trading impossible because people would potentially have a free put if they lost.  17 C.F.R. § 38.200

(DCMs may only list contracts not readily susceptible to manipulation); *id.* § 38.600 (DCMs must ensure financial integrity of transactions); *id.* §§ 38.1101(a)(1), (e) (financial resources requirements for DCMs).

*Fourth*, if extended to apply to Kalshi, Plaintiff's state law claims would disrupt the uniformity in regulation intended by Congress.  It would deter a DCM from offering certain types of event contracts based on the *in terrorem* effect of the application of New York and California state law, when the CFTC has already permitted the same contracts to be offered on the exchange. *Supra* I.B.  Worse still, because Kalshi is a 50-state federal market, the application of state law claims that regulate transactions on a DCM could have the effect of regulating Kalshi's conduct in *every* state.  Under the CFTC's Core Principles, Kalshi must "provide its members, persons with trading privileges, and independent software vendors with *impartial access*" to its national market and services.  17 C.F.R. § 38.151(b); *see* 7 U.S.C. § 7(d)(1)(A) (requiring that a board of trade comply with the CFTC's Core Principles); 17 C.F.R. § 38.150.   The "impartial access" requirement means that a federally registered DCM may not restrict access based on factors that would "result in discriminatory access or act as a barrier to entry," including, for example, where the user lives.  *Core Principles and Other Requirements for Designated Contract Markets*, 77 Fed. Reg. 36612, 36625 (June 19, 2012); *see also id.* (DCMs may only restrict access based on neutral principles like "financial and operational soundness" of the market participant).

## C.    Plaintiff's New York Loss Recovery Act Claims Must Be Dismissed (Counts I-II)

Plaintiff claims under N.Y. General Obligations Law § 5-419 and § 5-421 also should be dismissed because: (1) Plaintiff (a California resident) lacks standing to assert those claims because the LRA does not apply extraterritorially, and (2) Plaintiff fails to allege the necessary elements to state a claim under these statutes.

### 1.    Plaintiff Lacks Standing to Pursue Claims under the Loss Recovery Act

Plaintiff's claims under §§ 5-419 and 5-421 must be dismissed for lack of standing because these statutes do not have extraterritorial effect. *Zeltner v. Irwin*, 49 N.Y.S. 337, 338 (1st Dep't 1898) (the LRA has "no extraterritorial force"). Where, as here, a plaintiff's claim is "grounded purely on statute" and does not "turn[] on common-law doctrine," the appropriate inquiry into extraterritoriality is *not* the "test based on the significant contacts of the parties to the forum." *Manfredonia v. Am. Airlines, Inc.*, 416 N.Y.S.2d 286, 289 (2d Dep't 1979); *see also Brilliant v. Raidy*, 70 N.Y.S.2d 126, 128 (Mun. Ct. 1947) (New York's LRA "is in contravention of the common law"). Instead, in such cases, the "true inquiries must be whether New York intended that its statute should operate beyond its limits, and then, whether as a matter of Federal control, the statute can operate beyond the New York boundaries, even assuming that the statute may have been intended to have that effect." *Manfredonia*, 416 N.Y.S.2d at 289. Here, both inquiries independently foreclose extraterritorial application of §§ 5-419 and 5-421.

The LRA's statutory text and legislative history reflect that it was intended to deter gambling only between New York winners and New York losers. Neither § 5-419 nor § 5-421 contain "specific language" indicating that the legislature intended extraterritoriality. *Miramontes v. Ralph Lauren Corp.*, 2023 WL 3293424, at *7 (S.D.N.Y. May 5, 2023). Absent such language, "the presumption is that the statute is intended to apply only within the territorial jurisdiction of the state enacting it." *Id.* And this presumption is particularly strong in the context of legislatively created "special laws" enacted in abrogation of the common law, like New York's LRA. *S.H. v. Diocese of Brooklyn*, 167 N.Y.S.3d 171, 188 (2d Dep't 2022) (no extraterritoriality for statute reviving causes of action, which was legislatively created and "narrowly construed"); *see also Brilliant*, 70 N.Y.S.2d at 128 (New York's LRA "must be strictly construed").

The LRA's legislative history confirms what is clear from its text: it was not intended to have extraterritorial application. *See Zeltner*, 49 N.Y.S. at 338 (LRA has "no extraterritorial force" and "cannot operate to make unlawful any contract which was valid in the jurisdiction where it was made"); *Watts v. Malatesta*, 261 N.Y.S. 51, 53 (1st Dep't 1932) (LRA was "enacted to make effective the legislative purpose of suppressing gambling *in the community*" (emphasis added)); *Intercontinental Hotels Corp. (Puerto Rico) v. Golden*, 203 N.E.2d 210, 213 (N.Y. 1964) (declining to invalidate a Puerto Rico gambling contract where "there is no indication that the evils of gambling, which New York prohibits and Puerto Rico has licensed, will spill over into *our community*").

Plaintiff is a California resident and alleges that he entered into all of his transactions in California. ¶¶ 154-55, 160. He therefore lacks standing to pursue claims under §§ 5-419 and 5-421.

Plaintiff also lacks standing under New York's LRA for the same reasons he lacks Article III standing: He does not allege that he ever transacted in sports-event contracts or that he ever lost money based on those contracts. *See supra* Section III.A. Whether under the federal constitution or common law, a plaintiff cannot establish standing without "an injury in fact—an actual legal stake in the matter being adjudicated." *Soc'y of Plastics Indus., Inc. v. Cnty. of Suffolk*, 573 N.E.2d 1034, 1040 (N.Y. 1991).

### 2. The Complaint Fails to Adequately Allege the Necessary Elements of Any Claim under § 5-419 or § 5-421

#### a. Defendants are not winners or stakeholders under § 5-419 or § 5-421

Plaintiff fails to allege that Kalshi is a "winner" or "stakeholder" under the LRA. *See* N.Y. Gen. Oblig. Law § 5-419 (recovery available from "winner" or "stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof"); *id.* § 5-421

(recovery provided for "from the winner" of a bet).  To allege that Kalshi is a "winner," Plaintiff needs to establish that "money was paid *to* or received *by* [Kalshi] in connection with or as a result of [the] wager." *Federkowitz v. Holoweak,* 168 N.Y.S. 4, 5 (App. Term 1918); *see also People v. Coates*, 407 N.Y.S.2d 866, 872 (2d Dep't 1978) ("The civil law remedy contained in section 5-421 [ ] is designed to discourage gambling by putting people on notice that they may be divested of *their* winnings." (emphasis added)).  Plaintiff does not do so.  To the contrary, the Complaint alleges that the winners on Kalshi-traded contracts are those on the winning side of the swap, and Kalshi "matches bettors on opposite sides of the event contract," ¶ 55, and then "pays out *the winners.*"  ¶ 59 (emphasis added).  Plaintiff's allegation that Kalshi facilitates and handles the purported bets between winners and losers does not make them "winners" under New York's LRA. *Cf. Cross v. Sam Katz Distinctive Tours, Ltd.*, 338 N.Y.S.2d 717, 720 (Civ. Ct. 1972) (defendant who hosted "the apartment for the game" was a "disguised winner" because "the apparent winners at the two games *were not paid*" by the defendant, who kept the monies (emphasis added)).

Nor does the Plaintiff allege that any Kalshi entity's profits depend on the outcome of any event contract on which Plaintiff transacted.  Instead, Plaintiff seeks to recover Kalshi's transaction fee—not the alleged "winnings" from the outcome of an event.  ¶ 53 ("Kalshi makes money by raking in a fee on each transaction made on the platform.").  KalshiEX receives a transaction fee in exchange for providing users access to its CFTC-registered DCM, *id.*, but that fee has nothing to do with the probability or outcome of the event that is the subject of the contract.  Kalshi will receive the fee either way.  Indeed, KalshiEX's Member Agreement makes clear that trading fees are for "Services," which are defined as "access to a platform for trade execution . . . and . . . related services."  Ex. 2 at II.  The Complaint does not contain any non-conclusory allegation to support an inference that the transaction fee is unlawful gambling winnings, as opposed to valid

consideration for a contract with Kalshi to obtain access to its trading platform and services—as the Member Agreement specifically provides. And, although New York courts have yet to address the issue, the overwhelming weight of authority makes clear that such transaction fees do not violate the virtually identical Statutes of Anne in other states. *See, e.g., Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *9 (D.N.J. June 20, 2007) (operators of fantasy sports "plainly are not 'winners' as a matter of law, but merely parties to an enforceable contract," they provide "substantial consideration, in the form of administration," and "[a]t no time do [they] participate in any bet"); *Sonnenberg v. Oldford Grp., Ltd.*, 2015 WL 1379505, at *6 (S.D. Ill. Mar. 24, 2015) (operators of online poker games were not winners under the meaning of the LRA because they only "hosted" games but had not "participated" in them by placing bets or wagers or risking any of their own money); *Fahrner v. Tiltware LLC*, 2015 WL 1379347, at *7 (S.D. Ill. Mar. 24, 2015) (same).

Finally, Plaintiff does not adequately allege that any Kalshi entity is a "stakeholder or other person in whose hands shall be deposited any . . . wager" under § 5-419. "A stakeholder is one who holds a wager . . . and then pays the same *to the winner*." *Brilliant*, 70 N.Y.S.2d at 128 (emphasis added) (finding defendant was not liable as a stakeholder or "other person in whose hands shall be deposited any . . . wager" because the plaintiff was in sole control over the amount of money to be wagered and the defendant merely acted as a "messenger to transmit the monies"). And the same standard applies to any "other person in whose hands shall be deposited any . . . wager." *Id.* The Complaint fails to plead that any Kalshi entity is a stakeholder in any event contract or that Kalshi exercises any "discretion whatsoever" over the alleged wagers. *Id.* (alleged stakeholder could not be held liable where he exercised "no discretion whatsoever"). To the contrary, Plaintiff alleges that the users "deposit funds into *their* Kalshi account," and they can

withdraw any monies in their account if they "choose to withdraw."  ¶ 54 (emphasis added).  That falls yards short of pleading that Kalshi is a "stakeholder" or "person in whose hands" a wager is "deposited" under New York's LRA.

b.    Event contracts are not unlawful gaming under § 5-419 or § 5-421

Both §§ 5-419 and 5-421 are statutory rights of action that provide a right of recovery to an alleged loser for different types of unlawful gambling.  *Wilkenfeld v. Attic Club*, 134 N.Y.S. 507, 507 (Sup. Ct. 1911).  Section 5-419 applies to monies paid or deposited "***upon the event of any wager or bet***," whereas § 5-421 applies to "***playing at any game, or by betting on the sides or hands of such as do play***."  N.Y. Gen. Oblig. Law §§ 5-419 and 421 (emphasis added).  Based on the plain text of these statutes, the New York legislature "intended to distinguish" between (1) "acts of gambling, commonly known as bets or wagers contingent up[o]n [*sic*] the happening of an event, such as racing or elections" and (2) acts of gambling "which have to do with games of chance, such as card or dice playing."  *Wilkenfeld*, 134 N.Y.S. at 508.  Section 5-419 only applies to the former ("bets or wagers contingent upon the happening of an event"), and § 5-421 applies only to the latter (gambling on "games of chance").  *Id.*; *Langworthy v. Broomley*, 1864 WL 3629, at *93-94 (N.Y. Sup. Ct. 1864) (same).  Neither type of unlawful gambling applies to the event contracts traded on Kalshi's DCM.

(1)    Event contracts are not bets on "games of chance" under § 5-421

While neither § 5-419 nor § 5-421 apply to event contracts, at a minimum, they cannot both be the basis for recovery.  *Langworthy*, 1864 WL 3629, at *93 (§ 5-421 would be "useless" if § 5-419 provided recovery for the same types of unlawful wagers).  As between the two, event contracts are far more akin to bets or wagers "contingent upon the happening of an event" under § 5-419 than to playing a "game[] of chance, such as card or dice playing" under § 5-421.

35

*Wilkenfeld*, 134 N.Y.S. at 508.  For example, the Complaint alleges that event contracts are "yes" or "no" wagers on the occurrence of an event.  ¶¶ 62-63, 73; *see Wilkenfeld*, 134 N.Y.S. at 508; *Mendoza v. Levy*, 90 N.Y.S. 748, 749 (2d Dep't 1904) (wagering on the outcome of a horse race falls under § 5-419).  And there are no factual allegations suggesting that event contracts are a "game of chance."  To the contrary, Plaintiff purports to sue under § 5-421 for money lost on "unlawful betting and/or wagering"—the statutory language for a § *5-419 claim*.  ¶¶ 188-89.  Therefore, even if the challenged transactions constituted unlawful wagering, any losses would have to be recovered, if at all, under § 5-419.  For these reasons, the § 5-421 claim must be dismissed.

        (2)      <u>Event contracts are not unlawful bets under § 5-419 or § 5-421</u>

Regardless of whether event contracts can be classified as "bets" or "wagers" under § 5-419 or a "game of chance" under § 5-421, those claims fail because the statutes only apply to *unlawful* gambling.  N.Y. Gen. Oblig. Law § 5-419 (right of recovery for "prohibited" bets or wagers); *id.* § 5-401 (wagering upon "gaming by lot or chance . . . shall be unlawful").  Consistent with this statutory language, New York courts have repeatedly confirmed that the statute does not apply to lawful conduct.  *See Meech v. Stoner*, 19 N.Y. 26, 28 (1859) ("The right [in a LRA case] rests upon the illegality and the voidness of the transaction . . . ."); *Watts*, 261 N.Y.S. at 53 ("[The LRA adds] a further hazard to *illegal* gambling." (emphasis added)); *Carr v. State*, 221 N.Y.S.2d 636, 638-39 (Ct. Cl. 1961).  Furthermore, because the LRA does not "in and of itself, create a penalty" for gambling, a plaintiff must look elsewhere to establish the requisite illegality.  *Watts*, 261 N.Y.S. at 53; *see also Aiello v. Queens Cnty. Jockey Club*, 144 N.Y.S.2d 322, 323 (Sup. Ct. 1955) (dismissing complaint because "[p]ari mutuel betting upon legalized horse racing is not prohibited" and, as such, "[l]egal race track pari-mutuel betting is exempt from the provisions" of

the LRA). Plaintiff acknowledges as much by repeatedly alleging that Defendants engage in "unlawful" betting or wagering in violation of New York law. ¶¶ 117-20, 183, 185, 188-89.

But Plaintiff cannot plead illegality because the event contracts are authorized and regulated by federal law. *See supra* Section III.B; *see also Aiello*, 144 N.Y.S.2d at 323 ("The right of recovery is purely statutory and should be restricted to the extent and area clearly defined by law."). State and federal courts confronting this precise issue already hold that swaps (which include event contracts) are not illegal contracts to gamble. *Korea Life Ins. Co. v. Morgan Guar. Tr. Co. of N.Y.*, 269 F. Supp. 2d 424, 442 (S.D.N.Y. 2003) ("Derivatives transactions, forward contracts and swap agreements in currencies and commodities are not considered illegal gambles, and do not violate New York's gambling statute."); *Gen. Elec. Co. v. Metals Res. Grp. Ltd.*, 741 N.Y.S.2d 218, 219 (1st Dep't 2002) ("[T]he parties' contract was not an illegal contract to gamble, but rather a legitimate commodity swap agreement exempt from the strictures of [Gen. Oblig. Law § 5-401].").

          c.     <u>Plaintiff fails to allege any specific transactions under § 5-419 or § 5-421</u>

Plaintiff's claims under §§ 5-419 and 5-421 are also defective because he does not allege any information about the transactions for which he seeks to recover, such as the specific loss amount and dates for each claim. *See Mrowiec v. Polish Army Veterans Ass'n of Am., Post 124 of Syracuse, N.Y.*, 73 N.Y.S.2d 361, 366 (Sup. Ct. 1947) (dismissing a § 5-421 complaint because the plaintiff failed to plead "each loss" as a "a separate cause of action," and requiring specific allegations of the "dates and amounts claimed to be lost at each time"); *Betts v. Bache*, 1862 WL 4032, at *3 (N.Y. Super. Ct. 1862) (allegations of "time, amount and person" are "necessary" to

"definite and certain" allegations involving violations of betting and gaming laws).[14]  Plaintiff does

not allege any transaction on a challenged event contract, much less the date and amount, the role

each defendant played in that transaction, or any other relevant information that would be required

to assert a claim under New York's LRA, such that any transactions occurred within the last three

months, as required by § 5-421.  *See Mrowiec*, 73 N.Y.S.2d at 366.

### D.    Plaintiff Fails to State a Claim Under N.Y. Gen. Bus. Law § 349 (Count III)

Plaintiff's claim under GBL § 349 must be dismissed because (1) he lacks standing; (2) he

does not allege he saw any deceptive ads; (3) he fails to allege actual injury; (4) none of Kalshi's

statements were false or deceptive; and (5) Kalshi's conduct complies with federal law, *see supra*

Section III.B.

### 1.    Plaintiff Lacks Standing to Bring a GBL § 349 Claim

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or

commerce . . . *in this state*."  N.Y. Gen. Bus. Law § 349(a) (emphasis added).  The statute requires

a plaintiff to allege that they were "deceived in New York."  *Goshen v. Mut. Life Ins. Co. of N.Y.*,

774 N.E.2d 1190, 1195-96 (N.Y. 2002) (GBL § 349 "unambiguously evinces a legislative intent

to address commercial misconduct occurring within New York").  Because Plaintiff fails to allege

he was deceived in New York, he fails to state a cause of action under § 349.  *Id.*; *see also Haft v.

Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 459-60 (S.D.N.Y. 2022) (dismissing § 349

---

[14] The failure is particularly noteworthy here given that Plaintiff does not allege he suffered any losses within the last three months, which is the statute of limitations on his § 5-421 claim.  Plaintiff does not allege that he lost money in the last three months on any contracts, much less on a sports-related contracts.  ¶ 160 ("Within the past three months, Plaintiff has spent at least $25 on bets with Kalshi").  This vague allegation does not address whether he lost or won money on any of the challenged transactions, and Plaintiff's trading records reflect that he has not.

claim where transaction took place in New Jersey and plaintiff failed to allege he viewed allegedly deceptive statements in New York).

As discussed above, Plaintiff has no connection to New York.  While in California, he allegedly saw advertisements stating that the services provided by Kalshi were legal in California. ¶ 155.  His trades were placed by him "while in California."  ¶¶ 159-60.  Plaintiff identifies a few specific ads he claims were misleading, *e.g.*, ¶¶ 141-42, but concedes these posts were targeted at states other than New York, *e.g.*, ¶ 139 (Kalshi's advertisements were "directed to California residents"); ¶ 143 (in addition to California and Texas, Kalshi "target[ed] other states" including Georgia, Minnesota and Washington).  Indeed, Plaintiff alleges that Kalshi's advertising "specifically target[ed] states that have not legalized sports betting, including California and Texas," but not New York.  ¶ 140.

Plaintiff's failure to allege any deceptive conduct in New York requires dismissal of the GBL § 349 claim.  *See, e.g.*, *Kaufman v. Sirius XM Radio, Inc.*, 474 F. App'x 5, 6-7 (2d Cir. 2012); *Dorris v. Danone Waters of Am.*, 711 F. Supp. 3d 179, 187 (S.D.N.Y. 2024); *Miramontes*, 2023 WL 3293424, at *4-5; *Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d 102, 110 (E.D.N.Y. 2020); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 402-03 (S.D.N.Y. 2010).

### 2.    Plaintiff Does Not Allege That He Saw Any Deceptive Advertisements

Even if the Complaint alleged deceptive conduct in New York, the § 349 claim would still be subject to dismissal because Plaintiff fails to allege that he saw the purportedly deceptive advertisements.  *See, e.g.*, *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) (plaintiff must allege "that he has seen the misleading statements of which he complains before he came into possession of the products he purchased"); *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 240 (S.D.N.Y. 2020); *Wright v. Publishers*

*Clearing House, Inc.*, 372 F. Supp. 3d 61, 67 (E.D.N.Y. 2019) (same); *Quintana v. B. Braun Med. Inc.*, 2018 WL 3559091, at *10 (S.D.N.Y. July 24, 2018) (same).

Plaintiff has not alleged that he saw *any* specific advertising that was misleading.  Where the Complaint does identify specific advertisements, there is no allegation that Plaintiff ever saw them. *See, e.g.*, ¶¶ 141-42, 154-59.  Plaintiff alleges only that he saw "advertisements on Instagram for Kalshi" relating to the Presidential election in late 2024.  ¶¶ 155-56.  But those advertisements cannot be the basis for deception because they were months before Kalshi offered and advertised the challenged sports-event contracts.  Moreover, the Complaint does not even identify any specific statement in those advertisements that was purportedly false.  ¶ 63.  Plaintiff's failure to allege that he saw any allegedly misleading advertisement is fatal to his GBL § 349 claim.

### 3.    Plaintiff Fails to Allege an Actual Injury

To state a claim under GBL § 349, a plaintiff must allege that he suffered an "actual" injury *caused by* the allegedly deceptive act.  *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000). As an initial matter, having failed to allege that he viewed any misleading advertisement, any such ad could not have been material to Plaintiff and could not have caused him the alleged injury, *i.e.*, to trade on Kalshi's exchange.  *Id.* (plaintiffs must show that defendants' "material deceptive act caused the injury"); *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995) (same).

In any event, Plaintiff fails to allege an actual injury.  While the Complaint alleges that "*[s]ince November 1, 2024*, Plaintiff has lost over $2000," ¶ 160, those losses have nothing to do with the challenged conduct (*i.e.*, sports contracts which began trading *on January 23, 2025*, ¶ 63). For example, Plaintiff does not allege whether any of the $2,000 was lost after the allegedly false advertisements appeared, whether any of those losses were on sports-event contracts (they were not), or whether he suffered a *net* loss on all trades purportedly induced by allegedly misleading

information.  Because Plaintiff fails to allege an actual injury, he necessarily *also* fails to allege that Kalshi's allegedly deceptive acts caused an actual injury.

Furthermore, Plaintiff cannot recover under § 349 because he received the *full value of his purchase.*  To plead "actual injury" under § 349, a plaintiff must allege that because of the deceptive conduct, he purchased a product and "did not receive the full value of [his] purchase." *Braynina v. TJX Cos., Inc.*, 2016 WL 5374134, at *10 (S.D.N.Y. Sep. 26, 2016).  To meet this requirement, plaintiffs must allege "actual or pecuniary harm that is separate and apart from the alleged deception itself."  *Derbaremdiker v. Applebee's Int'l, Inc.*, 2012 WL 4482057, at *7 (E.D.N.Y. Sep. 26, 2012).  Plaintiff does not allege that he did not receive the full value of his purchase.  Nor could Plaintiff credibly claim that he did not receive that value, having "received exactly what was represented to him" through Kalshi's website, mobile application, and the advertisements he allegedly viewed.  *Id.* at *7 ("[P]laintiff received exactly what was represented to him on the receipt and the Website by entering the Sweepstakes—the chance to win . . . .").  Plaintiff alleges that his "sole reason" for setting up a Kalshi account was to gain access to "gambling services," which he alleges he received.  ¶ 164.  By creating a Kalshi account, Plaintiff gained access to Kalshi's DCM.  ¶ 164.  Accordingly, because Plaintiff received access to Kalshi's DCM, Plaintiff does not (and cannot) allege actual injury.  *See Derbaremdiker*, 2012 WL 4482057, at *7.

### 4.    Plaintiff Does Not Allege That the Advertisements Were Misleading

Plaintiff also needed to allege with specificity that the challenged statement was misleading in a "material way."  *Oswego*, 647 N.E.2d at 744.  Courts consider whether an act is deceptive objectively.  *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003).  Here, Plaintiff's claim of deception rests on the premise that Kalshi falsely claimed its trading was "legal."  That is not a false or deceptive statement as trading on its platform *is* legal under federal and state law, including New

York law.  To the extent the Complaint alleges trading is illegal as a form of gambling under state law, those laws would be preempted by the CEA.  *See supra* Section III.B.

### E.    Plaintiff's California-Law Claims Must Be Dismissed

Plaintiff brings claims under three California statutes: (1) California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL"), which prohibits "any unlawful, unfair or fraudulent business act or practice," *id.* § 17200; (2) California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* ("CLRA"), which prohibits "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale of goods, *id.* § 1770(a); and (3) theft by false pretenses under Cal. Penal Code § 496(c).  Each claim must be dismissed.

### 1.    California Law Prohibits Plaintiff from Recovering Alleged Gambling Losses

California's "strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions" bars Plaintiff's California-law claims.  *Kelly v. First Astri Corp.*, 84 Cal. Rptr. 2d 810, 819 (Ct. App. 1999).  "[T]he illegality of the transaction makes the loser in pari delicto with the winner, and public policy precludes courts from declaring and distinguishing between degrees of turpitude of parties who engaged in unlawful transactions."  *Id.* at 828.  Under this policy, no court "will aid or assist a plaintiff to recover money lost in a gambling game that is prohibited by law . . . absent a statute authorizing recovery of the gambling losses."  *Id.* at 828.  "[B]ecause California does not have a statute authorizing the recovery of gambling losses," a plaintiff lacks "standing to bring a civil cause of action to recover [such] losses."  *Ochoa v. Zeroo Gravity Games LLC*, 2023 WL 4291650, at *4 (C.D. Cal. May 24, 2023) (barring recovery of gambling losses under UCL and CLRA).

Here, all the California law claims hinge on the premise that sports-event contracts are illegal gambling, meaning Plaintiff cannot press those claims.  *See Jamgotchian v. Sci. Games*

*Corp.*, 371 F. App'x 812, 813 (9th Cir. 2010) (affirming dismissal based on "California's public policy against judicial resolution of civil claims arising out of gambling contracts or transactions"); *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 2025 WL 2782591, at *9-10 (N.D. Cal. Sep. 30, 2025) (dismissing with prejudice California law claims alleging illegal gambling); *Mason v. Mach. Zone, Inc.,* 140 F. Supp. 3d 457, 466 (D. Md. 2015) (noting California's public policy barred recovery of alleged wagers under UCL), *aff'd*, 851 F.3d 315 (4th Cir. 2017).

### 2. Plaintiff Fails to Plead Claims Under California Law (Counts V-VII) With the Particularity Required by Rule 9(b)

Because Plaintiff alleges a fraudulent course of conduct, his California law claims are grounded in fraud and must be pleaded with particularly under Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126-127 (9th Cir. 2009) (Rule 9(b)'s heightened pleading standards apply to claims for violations of CLRA and UCL); *Core Focus Consulting 2, LLC v. RenewAge Energy Sols., Inc.*, 2024 WL 3403115, at *3 (C.D. Cal. July 12, 2024) ("[c]laims sounding in fraud" brought under California Penal Code § 496 "must comply" with Rule 9(b)). As such, for each of the California law claims, Plaintiff must plead with particularity that he saw the allegedly false statement and that his reliance on that statement caused his injury. *See* UCL § 17204; Cal. Civ. Code § 1780(a); *Meyer v. Sprint Spectrum L.P.*, 200 P.3d 295, 303 (Cal. 2009) (CLRA requires a "palpable threshold of damage"); *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 884 (Cal. 2011) (under UCL "standing is limited to any 'person who has suffered an injury in fact and has lost money or property' as a result of unfair competition" (quoting § 17204)); *ELT Sight, Inc. v. EyeLight, Inc.*, 2021 WL 6618552, at *8 (C.D. Cal. Oct. 22, 2021) (California Penal Code § 496 requires the false representation to have "materially influenced the owner to part with the property"). The Complaint contains no such particularized allegations.

While the Complaint alleges false statements in Kalshi advertisements (*e.g.*, ¶¶ 87, 89, 91-93, 141-42), Plaintiff does not allege he saw those statements.  At most, Plaintiff alleges that in setting up and using his Kalshi account, "[he] expressly relied upon Kalshi's representations that the services it provides in California are legal."  ¶ 158.  However, this allegation does not satisfy Rule 9(b)'s heightened pleading standard as Plaintiff does not allege he saw any particular statement, where the statement appeared, when he saw it, and which defendant made that representation.[15]  *See, e.g.*, *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1014 (N.D. Cal. 2014) (dismissing UCL and CLRA claims because plaintiff did "not allege[] with sufficient detail what representations he reviewed, when he first reviewed them, or which ones he relied on in deciding to purchase [the product]"); *Brady v. Anker Innovations Ltd.*, 2020 WL 158760, at *9 (S.D.N.Y. Jan. 13, 2020) (dismissing CLRA and UCL claims for failing to satisfy Rule 9(b) where complaint engaged in group pleading and "fail[ed] to identify the speaker").  Moreover, Plaintiff's alleged reliance is not plausible because Kalshi did not offer sports-event contracts when Plaintiff created his account.  *Compare* ¶ 71 (Kalshi started offering sports-event contracts on January 23, 2025), *with* ¶ 155 (Plaintiff created account "[o]n or about October 30, 2024").

### 3. Plaintiff's Unfair Competition Law Claim (Count V) Also Fails Because Kalshi's Platform is Not Unlawful or Unfair

To assert a claim under the UCL, a plaintiff must allege that Kalshi engaged in (1) "unlawful" conduct (*i.e.*, a violation of another law); (2) "unfair" conduct; or (3) "fraudulent" conduct.  Cal. Bus. & Prof. Code § 17200; *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427, 435 (Ct. App. 2024).  Plaintiff alleges violations of only the unlawful and unfair prongs.  ¶¶ 212-16.  To

---

[15] The Complaint defines "Kalshi" as the collective term for all Defendants.  ¶ 2.  Throughout the Complaint, Plaintiff refers to the actions of Defendants collectively without attribution.

satisfy the unlawful prong, a separate unlawful offense must be sufficiently pled. *Smith v. Intel Corp.*, 745 F. Supp. 3d 853, 868 (N.D. Cal. 2024).

Here, Plaintiff's alleged bases for unlawfulness fail. As an initial matter, any finding of unlawfulness is preempted. *See supra* Section III.B. Even if it were not, the attempt to predicate his UCL claim on alleged violations of the CLRA and Penal Code § 496(a) fails because, as explained in Sections III.E.1-2 and III.E.4-5, he has not sufficiently pled a violation of those statutes. Alternatively, the Complaint asserts a grab bag of alleged offenses but offers only conclusory allegations that do not withstand scrutiny. For example, the cited Penal Code sections addressing California's gambling prohibitions (¶ 212) do not apply here for the following reasons:

- **§§ 319-321**: Plaintiff's allegation that Kalshi operates an illegal lottery or game of chance fails as a matter of law. A "lottery" requires the distribution of property "by chance" from a pooled fund in exchange for consideration. Cal. Penal Code § 319. Kalshi's DCM facilitates the trading of bilateral event contracts priced by supply and demand, involves neither a pooled fund nor a "distribution" of property, and therefore does not constitute a lottery. *See People v. Postma*, 160 P.2d 221, 222-23 (Cal. App. Dep't Super. Ct. 1945).

- **§ 330**: The allegation that Kalshi operates an illegal "banking or percentage game" is without merit. A "banking game" is one where the "house" acts as the counterparty to all players and pays winners from its own "funds." *Sullivan v. Fox*, 235 Cal. Rptr. 5, 8-9 (Ct. App. 1987). A "percentage game" involves the house taking a share of the pot "exclusive of charges or fees." *Id*. at 10. No defendant is alleged to be a "counterparty to all players," nor are they alleged to pay winners from their own funds. And defendants are not alleged to take a share of the pot "*exclusive* of charges or fees;" to the contrary, Plaintiff alleges that Kalshi profits from a fee. ¶¶ 53-54.

   **§ 330a**: Kalshi's platform is not a slot machine or a chance-based gambling device, and does not involve a "machine, contrivance, appliance or mechanical device" that dispenses winnings. Cal. Penal Code § 330a(a).

- **§ 337a**: Plaintiff fails to allege that any Kalshi defendant engaged in "pool selling" or "bookmaking" in violation of § 337a. "Pool selling" involves distributing winnings from a common wagering pool. *People v. Coppla*, 224 P.2d 828, 830 (Cal. Dist. Ct. App. 1950). "Bookmaking" involves setting odds and taking bets as a counterparty. *People v. Thompson*, 24 Cal. Rptr. 101, 104 (Dist. Ct. App. 1962). As explained above, Kalshi does not manage pooled funds or engage in

bookmaking. Nor does Kalshi receive, hold, record, register, offer, or accept stakes, pledges, bets, or wagers in violation of § 337a.

- **§ 337j**: This section applies to card games like poker, which is inapplicable here. Cal. Penal Code § 337j(e)(1).

Plaintiff's UCL claim also fails to the extent it is premised on the "unfair" prong. "A business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers." *McKell v. Wash. Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (Ct. App. 2006). Courts weigh the harm of the practice to the consumer against its justifications and the defendant's motives. *See, e.g.*, *Pro Water Sol., Inc. v. Angie's List, Inc.*, 457 F. Supp. 3d 845, 854 (C.D. Cal. 2020); *Swafford v. Int'l Bus. Machs. Corp.*, 408 F. Supp. 3d 1131, 1151-152 (N.D. Cal. 2019).

Plaintiff's claim fails because participation on Kalshi's DCM is voluntary, informed, and reasonably avoidable. Users must affirmatively enroll, undergo age and identity verification, and choose whether, when, and how much to trade. ¶¶ 52, 54, 102. KalshiEX transparently discloses fees, and the platform incorporates risk-control features, like a Personalized Funding Cap. ¶¶ 53-54, 104. These safeguards undercut any claim of oppressive or unscrupulous conduct. Because KalshiEX earns standardized transaction fees regardless of trading outcomes, it does not "win" when users "lose," distinguishing it from schemes that courts have deemed unfair. Conclusory assertions about addiction or societal costs do not plausibly allege that Defendants' specific practices are oppressive or substantially injurious under the UCL.

Moreover, Defendant's platform provides substantial consumer benefits that outweigh any alleged harm. As Plaintiff admits, users can hedge risks and manage their financial exposure. ¶¶ 52, 54. The platform's consumer safeguards, including age and identity verification, funding limits, and robust federal oversight, far exceed those in the state law gambling contexts Plaintiff invokes. ¶¶ 98-99, 102, 104. Plaintiff has not pleaded facts showing that Defendant's practices

46

are immoral or that their alleged harms outweigh their clear benefits. Accordingly, the UCL claim also fails under the "unfairness" prong.

### 4. Plaintiff Fails to State a Claim Under California's Consumer Legal Remedies Act (Count VI)

The CLRA is not a law of general applicability. *Fairbanks v. Superior Ct.*, 205 P.3d 201, 206 (Cal. 2009). It "applies only to transactions for the sale or lease of consumer 'goods' or 'services' as those terms are defined in the act." *Id.* A "consumer" is someone "who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d). "Services" are defined as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." *Id.* § 1761(b). "Goods" means "tangible chattels." *Id.* § 1761(a).

The event contracts offered on the KalshiEX platform are not tangible chattel. *See Wixon v. Wyndham Resort Dev. Corp.*, 2008 WL 1777590, at *4 (N.D. Cal. Apr. 18, 2008) ("[T]angible property refers to things that can be touched, seen, and smelled."). Neither are they "work or labor, nor is it related to the sale or repair of any tangible chattel." *Fairbanks*, 205 P.3d at 203 (life insurance is not a service under the CLRA). Because the Complaint does not relate to goods or services, the CLRA claim should be dismissed. *See, e.g.*, *Marks v. United Parks & Resorts, Inc.*, 2025 WL 2767941, at *6-8 (S.D. Cal. Sep. 26, 2025) (dismissing CLRA claim because amusement park tickets are not goods or services under the CLRA); *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1116-17 (N.D. Cal. 2016) (dismissing CLRA claim because "software utilized entirely online" is not a good or service); *Kissling v. Wyndham Vacation Resorts, Inc.*, 2015 WL 7283038, at *3 (N.D. Cal. Nov. 18, 2015) (dismissing CLRA claim because "timeshare points do not fall under the CLRA's definition of 'goods' or 'services.'").

5.    **Plaintiff Fails to State a Claim Under California Penal Code § 496(c) (Count VII)**

The claim under California Penal Code § 496 (Count VII) also must be dismissed because the Complaint does not allege with particularity that any Defendant had criminal intent. *ELT Sight,* 2021 WL 6618552, at *8. Pleading criminal intent requires more than "actual falsity." *Siry Inv., L.P. v. Farkhondehpour*, 513 P.3d 166, 184 (Cal. 2022); *id.* ("not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft"). The Complaint does not allege any particularized facts that would establish criminal intent, or even that any Defendants knew its statements were false. The § 496 claim must be dismissed. *E.g., Formic Ventures LLC v. SomaLogic, Inc.*, 2023 WL 6037899, at *1 (N.D. Cal. Sep. 15, 2023) ("the lack of alleged criminal intent defeats [§ 496] claims").

F.    **Plaintiff Fails to State a Claim for Unjust Enrichment (Count IV)**

To adequately plead a claim for unjust enrichment, Plaintiffs must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012); *see Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (similar under California law).[16] "While a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, there must exist a relationship or connection between the parties that is not too attenuated." *Georgia Malone*, 973 N.E.2d at 746. Unjust enrichment "is not a catchall cause of action to be used when others fail." *Corsello v.*

---

[16] Plaintiff fails to allege which state law governs his unjust enrichment claim. In any event, Plaintiff cannot sustain the cause of action under either New York or California law, the two states most relevant to the Complaint.

*Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). It is only available in those "unusual situations" where "circumstances create an equitable obligation running from the defendant to the plaintiff," such as where the defendant "has received money to which [it] is not entitled." *Id.* Plaintiff's unjust enrichment claim fails for four reasons.

*First,* the failure to plead facts identifying with any specificity the benefit allegedly received by each Defendant "is fatal to [Plaintiff's] unjust enrichment claims." *Caplan v. Dollinger*, 2025 WL 1808530, at *9 (S.D.N.Y. June 30, 2025); *Gillespie v. St. Regis Residence Club, N.Y. Inc.*, 343 F. Supp. 3d 332, 352-53 (S.D.N.Y. 2018) (reliance on "imprecise group pleading" was fatal to plaintiff's unjust enrichment claim); *see supra* Section III.E.2.

*Second*, Plaintiff's unjust enrichment claim is impermissibly duplicative of his other deficient state statutory claims and so must be dismissed for the same deficiencies. *See Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 44-46 (S.D.N.Y. 2023) (Rochon, D.J.) (dismissing unjust enrichment claim that was "premised on similar allegations as the[] other claims" including deficient GBL § 349, CLRA, and UCL claims); *Clark v. Incomm Fin. Servs.*, Inc., 2024 WL 3005905, at *5 (C.D. Cal. May 30, 2024) ("Plaintiff's unjust enrichment claim is derivative of her CLRA and UCL claims, and therefore rises or falls with those claims."). Because Plaintiff's unjust enrichment claim rests on his allegation that Plaintiff "conferred benefit upon Defendants by paying Defendants to participate in their unlawful betting and wagering scheme" (¶ 202)—the same factual premise underlying his state statutory claims—the unjust enrichment claim must be dismissed.

*Third,* Plaintiff agreed to Kalshi's terms of service, which is a contract between the parties defining their rights and obligations. ¶¶ 164-65; *see also* ¶¶ 3-4 (referring terms of service and alleging Plaintiff did not receive the "benefit of the bargain"). But an unjust enrichment claim is

not available where "the relationship between the parties was defined by a valid written contract," *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 826 N.Y.S.2d 392, 395 (2d Dep't 2006), or the claimant "seek[s] damages for events arising from the same subject matter that is governed by an enforceable contract," *Bettan v. Geico Gen. Ins. Co.*, 745 N.Y.S.2d 545, 546 (2d Dep't 2002).

*Fourth,* Plaintiff fails to state a claim for unjust enrichment because he does not allege a benefit that has been conferred on Defendants that would be unjust for them to retain. To the extent that Plaintiff's unjust enrichment claims rests on the allegation that "Defendants enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements" (¶ 205), Plaintiff has not alleged that Defendants were enriched at Plaintiff's expense. Because Plaintiff fails to explain how saving costs came at Plaintiff's expense, he cannot sustain a claim for unjust enrichment. *See Olson v. Major League Baseball*, 447 F. Supp. 3d 159, 172 (S.D.N.Y. 2020) ("Plaintiffs' unjust enrichment claims fail because the plaintiffs have failed to plausibly allege that the defendants were enriched at plaintiffs' expense."), *aff'd,* 29 F.4th 59 (2d Cir. 2022); *see also E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 457-58 (2018) ("costs and expenses that otherwise would have been payable to third parties . . . do not constitute funds held by the defendant 'at the expense' of the plaintiff").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court compel arbitration under the FAA, 9 U.S.C. § 4, and, in the alternative, dismiss the Complaint with prejudice.

Dated: January 20, 2026
New York, New York

Respectfully submitted,

/s/ *Sean M. Murphy*
Sean M. Murphy
Katherine Kelly Fell
Matthew J. Laroche
Andrew L. Porter
Ashley A. Satterlee
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
smurphy@milbank.com
kfell@milbank.com
mlaroche@milbank.com
aporter@milbank.com
asatterlee@milbank.com

Joshua B. Sterling (pro hac vice)
MILBANK LLP
1101 New York Avenue NW
Washington D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
jsterling@milbank.com

*Counsel for Defendants KalshiEX LLC,*
*Kalshi Inc., Kalshi Klear LLC, Kalshi Klear*
*Inc., and Kalshi Trading LLC*

**Local Civil Rule 7.1(c) Certification**

Undersigned counsel hereby certifies that this Memorandum of Law complies with the word count limitations and rules set forth in Local Civil Rule 7.1(c), as well as ECF No. 26, the court order modifying the word limit. Undersigned counsel has relied on the word count of the word-processing program used to prepare this document and states that the applicable portions of the document contain 16,653 words.

Dated: January 20, 2026
New York, New York

Respectfully submitted,

/s/ *Sean M. Murphy*
Sean M. Murphy
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
smurphy@milbank.com

*Counsel for Defendants KalshiEX LLC,*
*Kalshi Inc., Kalshi Klear LLC, Kalshi Klear*
*Inc., and Kalshi Trading LLC*